substituted OPINION OP JANUARY 29, 1917.
Downey, Judge,
reviewing the facts found to be established, delivered the opinion of the court:
The plaintiff in this action seeks to recover $8,026.69, alleged to have been unlawfully assessed and collected under sections 29 and 30 of the war-revenue act of June 13, 1898, as a legacy tax on the interest of the plaintiff in a trust fund of $125,000, arising under the will of Edmund Dwight, deceased. The facts are very fully set out in the findings and are too voluminous to justify repetition here.
We are favored with elaborate and able briefs on the questions upon which counsel assume that the decision of the case must depend, and we have found the facts necessary to their determination, but, to us, it appears that there are preliminary and material questions for our consideration which have not received the attention of counsel on either side, and the determination of which may render it unnecessary for us to give any consideration to the questions discussed.
*74 Suit on this claim would have been barred under section 8227, Revised Statutes, which provides that such actions as this must be brought within two years next after the cause of action accrued, and the filing of a claim with the Commissioner of Internal Revenue would have been barred under section 3228, Revised Statutes, which requires that the claim be filed within two years next after the cause of action accrued, but for the act of July 27, 1912, 87 Stat., 240, which authorized the filing of such claims with the Commissioner of Internal Revenue at any time on or before the first day of January, 1914, but not thereafter.
However section 3226, Revised Statutes, as amended, is unaffected by the act of July 27, 1912, and that section prohibits the maintenance of any suit in any court for the recovery of any internal tax alleged to have been erroneously or illegally assessed or collected until appeal shall have been made to the Commissioner of Internal Revenue, according to the provisions of law in that regard, and the regulations of the Secretary of the Treasury established in pursuance thereof and a decision of the commissioner has been had therein, with a proviso that if such decision is delayed more than six months from the date of such appeal suit may then be brought without first having a decision of the commissioner. That compliance with this section of the statute is essential before suit may be maintained has been frequently held and is now practically an uncontroverted proposition. The Collector v. Hebbard, 12 Wall., 1-14: Savings Institution v. Blair, 116 U. S., 200; Savings Bank v. United States, 16 C. Cls., 335; Erskine v. Hornbach, 14 Wall., 613; Commissioners v. Buckner, 48 Fed. Rep., 535; Christie-Street Com. Co. v. U. S., 129 id., 506; S. & S. Co. v. Rucker, 143 id., 656; Hastings v. Herold, 184 id., 759.
The plaintiff presumably relies, as compliance with this section of the statute, upon a claim filed with the Commissioner of Internal Revenue on the 24th day of December, 1913, set out in Finding IX, and its rejection on the 28th day of March, 1914. This claim is signed “ H. T. Newcomb,” and in the body thereof he is showm to be “ attorney for the New England Trust Company, of Boston,' trustee under the *75 will of Edmund Dwight,” and a power of attorney executed to him by the New England Trust Company as trustee is on file, although not brought into the record on which the case is submitted. It does not appear that any claim was ever filed by Jennie Lathrop Rand, the plaintiff herein, who brings this suit in her own proper right.
We question, in the first place, the propriety of the presentation of any claim to the Commissioner of Internal Revenue by the New England Trust Company, since it not only does not appear that the trust company paid this tax, but it does appear that it was paid with money procured by the plaintiff to be furnished for the purpose, before the trust fund went into the hands of the trust company. But, without regard to whether the trust company might properly have filed a claim for refunder, and even assuming for present purposes that it might have done so, it seems too conclusive to justify argument that a claim so filed with the Commissioner of Internal Revenue could not, under this statute, constitute the requisite basis for a suit in this court by Jennie Lathrop Rand in her own right. If we are correct in this conclusion, and it seems to us that there can be no question about it, it is clear that upon that ground alone this suit may not be maintained. But there is yet another undiscussed question to which we will briefly refer.
It appears that on the 27th day of September, 1900, Elizabeth Cabot, then the executrix of the will of Edmund Dwight, deceased, made a return to the Commissioner of Internal Revenue as to legacies under the will of said decedent* returning this trust fund as in trust with the New England Trust Company, with a statement as to taxable value of the interest of the plaintiff, Jennie Lathrop Rand, therein, and the amount of taxes due thereon. That on the same day this plaintiff, joined by others, entered into a contract with Elizabeth Cabot, set out in Finding IV, by which they procured the loan or advancement by Elizabeth Cabot of the money necessary to pay this tax, and that it was paid on the same day with funds loaned or advanced by Elizabeth Cabot out of the assets of the estate of Edmund Dwight, and that the sum so loaned or advanced was there *76 after repaid by Jennie Lathrop Hand. This transaction was two days before the trust fund of $125,000 was turned over to the New England Trust Company.
It seems quite clear to us that this payment was wholly within the rule with reference to voluntary payments. It is quite well settled that taxes voluntarily paid, not under protest or with notice of intention to test their validity, and not under duress, can not be recovered. Cox v. The Collector, 12 Wall., 204-209; Folsom v. United States, 4 C. Cls., 366; United States v. Edmonston, 181 U. S., 500; Cheseborough v. United States, 192 U. S., 253; United States v. N. Y. & Cuba Mail S. S. Co., 200 U. S., 488; Christie-Street Commission Co. v. United States, 126 Fed. Rep., 991; Herold v. Kahn, 159 Fed. Rep., 608; Thacher v. United States, 149 Fed. Rep., 902; Newhall v. Jordan, 149 Fed. Rep., 586; Beer v. Moffatt, 192 Fed. Rep., 984.
It does not appear that there was any protest whatever against the assessment of this tax, or that it was paid with any declaration of any intention whatever to contest its validity. If it is to be relieved from the onus of a voluntary payment, it must be upon the theory alone that it was paid under compulsion of law amounting to such duress as relieved from the necessity of protest. This theory, we think, can not be maintained. The authorities will not support it. Citations, supra.
We make no point upon any possible question as to whether there was any obligation on the executrix to pay this tax before the trust fund itself was turned over to the trustee. She did it and not only without protest but, so far as appears, without demand made upon her for its payment, and while, treated as a payment by her and properly made, it must be regarded as, in legal contemplation, a voluntary payment, there are circumstances which require us to go one step further to reach the true situation.
Under the facts as they appear in this case, it is shown that this tax was paid with money loaned or advanced by the executrix out of the assets of the estate of Edmund Dwight, pursuant to an agreement entered into as between her, individually, and this plaintiff joined by others in in *77 terest. We need not discuss the question as to the right of the executrix to advance money from the assets of the estate for this purpose. She did it. If she did it without authority, and the estate suffered, the liability was upon her and her bond. But, however that may be, this plaintiff procured, by her agreement to repay, the loan or advancement of the money used for the purpose, and afterward repaid it, and it must be concluded, from all the facts, that the payment when made was, in effect, made by this plaintiff. She was under no obligation to make it, at least at the time payment was made. It was not necessary that she should make it in order to protect her interests under the trust. It was evidently a mere matter of convenience to the end that she might repay it in installments and avoid the deduction of the whole amount of the tax, at one time, either from the body of the trust fund or, and as they understood the situation, from the legacies accruing to her. The facts of the case carry it far beyond those appearing in most of the cases held by the courts to have been within the rule as to voluntary payments.
Lest it may be assumed that we have not given it consideration, it may be well to distinguish the case of United States v. Hvoslef, 237 U. S., 1, in which it was held that there might be recovery without protest having been made.
In that case recovery was sought of the amount paid as stamp taxes on certain charter parties under section 25 of the war-revenue act of 1898. The act of June 27, 1902, 32 Stat., 406, and other refunding statutes hereinafter cited, had provided specifically for the refunding of certain classes of taxes collected under the war-revenue act of 1898. Since the fact appears beyond question that the taxes sought to be recovered in this case are not within any of the classes enumerated in any of the refunding acts, that fact would easily dispose of the question of the applicability of that case to this one but for some language in the opinion apparently giving possible room for another view.
The time having expired within which claims might be filed or actions instituted for refunder of taxes either under the act of 1902 or other refunding acts or under the general statute with reference to refunder of taxes erroneously *78 assessed, Congress on July 27, 1912, passed “An act extending the time for the repayment of certain war-revenue taxes erroneously collected.” 37 Stat., 240. By the first section of that act it was provided that claims for the refunding of any taxes erroneously or illegally assessed or collected under section 29 of the war-revenue act of 1898 might be presented to the Commissioner of Internal Revenue on or before January 1, 1914, but not thereafter. By the- second section the Secretary of the Treasury was directed to pay to such claimants as have so presented their claims “ and shall establish such erroneous and illegal assessment and collection” any amounts paid by them.
The decision in the Hvoslef case, if not carefully studied in the light of various statutes and other decisions, may leave some room for doubt as to its meaning by reason of the fact that the opinion states that the action was based on the act of July 27, 1912, holds protest unnecessary and in holding that that act is not limited to the refunding of death duties erroneously assessed under section 29 of the war-revenue act, as contended by the Government, quotes the words “ any sums paid by them * * * to the United States under the provisions of the act aforesaid ” from the second section of the act of 1912 authorizing payment by the Secretary of the Treasury.
The decision must be interpreted in the light of the particular case under consideration, all other statutes and rules of law proper for consideration and necessarily known to the court and any other applicable expressions of the court in other cases.
The act of June 27, 1902, preceded as to certain limited cases by the act of May 12, 1900, was followed by other refunding acts, but up to the time of its passage any claims for refunder of taxes except those arising under the act of 1900 must have been made and could only be made under the general statute providing for the refunding of taxes erroneously or illegally assessed or collected. The assertion of a right to recover thereunder was subject to well established and uncontroverted principles of law and recovery could not be had if the payment was made without protest and under such *79 circumstances as constituted a voluntary payment. The court in deciding the Hvoslef case was, of course, fully cognizant of this well-established rule and can not be presumed to have intended to abrogate a rule of such long standing except in classes of cases with reference to which legislation by Congress rendered it inapplicable.
In the Cheseborough case, 192 U. S., 253, recovery of stamp taxes on conveyances of real estate was sought under the general statute (sec. 3220), the doctrine as to protest and voluntary payment was strongly adhered to by the court, and it was held that the circumstances of the case did not render protest unnecessary.' And referring to voluntary payments without protest the court concludes, “ We find no right of recovery, expressly or by necessary implication, conferred by statute in such circumstances.” In the N. Y. & Cuba Mail S. S. Co. case, 200 U. S., 498, in which recovery was sought of the amount paid for documentary stamps used on manifests of cargoes bound to foreign ports, the Cheseborough case was followed with approval, and it was further held that the act of May 12, 1900, 31 Stat., 177, authorizing, by the use of the word “ may,” the Commissioner of Internal Revenue to make allowance for or redeem internal-revenue stamps spoiled, destroyed, or rendered unfit for the purpose intended, or which through mistake may have been improperly or unnecessarily used, did not destroy the difference between voluntary and involuntary payments of taxes. Here it is well to observe that the act cited provided that the Commissioner of Internal Revenue “may” make allowance for or redeem stamps upon receipt of satisfactory evidence of the facts, with a limitation of two years from the time of the purchase of the stamps, and the general statute (sec. 3220) provides that under certain regulations he is “ authorized” to refund taxes erroneously or illegally assessed or collected, with a two-year limitation (sec. 3228), while the act of June 27, 1902, specifically directs the Secretary of the Treasury to refund certain classes of taxes, with no limitation prescribed, and hence subject to the limitation of section 3228.
*80 Following the decision of February 19, 1906, in the N. Y. & Cuba Mail S. S. Co. case, Congress, by the act of March 4, 1907, 34 Stat., 1371-1373, appropriated $125,000 to enable the Secretary of the Treasury to refund “the sums paid for documentary stamps used on export ships manifests,” the kind of refunder claimed in that case, “ such stamps representing taxes which were illegally assessed and collected, said refund to be made whether said stamp duties were paid under protest or not, and without being subject to any statutes of limitations.” By the act of February 1, 1909, 85 Stat., 590, the Secretary of the Treasury was “ directed ” to pay to those who had filed claims before July 1, 1904, the sums paid for documentary stamps used on foreign bills of exchange, drawn between July 1, 1898, and June 30, 1901, against the value of exports to foreign countries, “said stamps representing taxes which were illegally assessed and collected, said refund to be made whether said stamp taxes were paid under protest or duress or not.” By the act of August 5, 1909, 38 Stat., 118-120, the time for filing claims under the act of February 1,1907, supra, was extended to December 1,1909; by the act of June 25, 1910, 36 Stat., 774-779, it was extended to December 1, 1910; and by the act of August 26, 1912, 37 Stat., 595-626, it was extended to December 31, 1912.
A correct understanding of the effect of the decision in the Hvoslef case requires consideration of the holdings of the Supreme Court as to the validity of taxes of the kind directly and indirectly involved therein and the action of Congress with reference thereto.
In Fairbanks v. United States, 181 U. S., 288, decided April 15, 1901, it was held that the stamp tax imposed by the war-revenue act of 1898 on export bills of lading was a tax or duty on exports, and therefore unconstitutional. Any such tax was therefore “ illegally assessed,” and Congress, in the second section of the act of June 27, 1902, directed the refunding of sums paid for documentary stamps used on export bills of lading, “ such stamps,” the act says, “ representing taxes which were illegally assessed and collected.”
In N. Y. & Cuba Mail S. S. Co. v. United States it was held, on authority of the Fairbanks case by the district *81 court, 125 Fed. Rep., 320, that the stamp tax imposed on manifests of cargoes for export was a tax on exports and unconstitutional. On appeal the case was disposed of on the question of voluntary payment without protest, but of the other question it is said in the opinion in the Hvoslef case that “the correctness of this ruling (by the district court) as to the invalidity of the tax was conceded by the United States.” Followed the act of May 4, 1907, supra, providing for refunder of this particular class of stamp taxes without regard to protest and declaring that such stamps represented “ taxes which were illegally assessed and collected.”
These two cases involved two classes of stamp taxes provided for in the war-revenue act of 1898, (1) taxes on export bills of lading, (2) taxes on manifests of cargoes for export which were held to be taxes on exports, therefore unconstitutional, therefore “illegally assessed.” They were followed by the Hvoslef case, which involved a stamp tax on certain charter parties which “were exclusively for the carriage of cargoes from ports in the States of the United States to foreign ports,” and in which it was held, citing the Fairbanks case and the N. Y. & Cuba Mail S. S. Co. case, that this tax was also a tax on exports and unconstitutional. It was therefore illegal, as were the other taxes of this character, ab initio.
After citing, in the opinion of the Hvoslef case, the act of 1902, directing, among other things, the refunding of taxes assessed on foreign bills of lading, and the act of 1907, directing the refunding of taxes on manifests of cargoes for export, and the act of 1909, directing the refunding of taxes on foreign bills of exchange drawn against the value of exports to foreign countries, a tax which under the decision cited must also have been held unconstitutional, and the three acts which extended the time for filing claims of the latter class, the court immediately thereafter refers to the act of 1912, which was also “An act extending the time,” etc., and says:
“It thus appears that the act of 1912, upon which the present claim is based, was the culmination of a series of statutes which leave no question as to the intention of Con- *82 gross to create an obligation on the part of the United States in favor of those holding the described claims (italics ours), and it follows that these claims must be deemed to be founded on a ‘ law of Congress ’ within the meaning of the provisions of the Tucker Act now incorporated in the Judicial Code.”
The words used, “the described claims,” probably were used with reference only to the classes of claims under discussion, but, be that as it may, this language is clearly directed to the question of jurisdiction and not in any sense to the question of protest or involuntary payment as a prerequisite to a right of recovery. It is followed by a reference to the jurisdiction of this court, a holding that the act of 1912 does not refer only to the.refunding of taxes assessed under section 29 of the war-revenue act, as contended, but to any sums wrongfully collected, a necessary holding in view of the fact that none of the taxes considered in the cases referred to were collected under section 29, and a further consideration of the question of jurisdiction as to the particular district within which the suit might be brought.
The further language of the opinion, referring specifically to payments without protest, is for consideration. It is said :
“ It is also apparent, in the the light of the manifest purpose and scope of the legislation to which we have referred, that the contention based upon the absence of protest can not be sustained. Where taxes have been illegally assessed upon the ‘ contingent interests ’ described in the refunding act of 1902 it has been held that recovery may be had although the taxes were paid without protest. United States v. Jones, supra. In the acts of 1907 and 1909, supra, with respect to stamp taxes on ‘export ships’ manifest’ and on foreign bills of exchange against exports, Congress expressly provided for refunding, whether the taxes had been paid under protest or not. The fact that these express words were not repeated in the act of 1912 can not, in view of the nature of the subject, be regarded as evidencing a different intent; rather must this act receive in this respect the same construction as that which has been given to the act of 1902. If it appeared that the sums sought to be recovered were not legally payable, and the claim was duly presented within the time fixed, the right to repayment was established by the express terms of the statute.”
*83 It must be evident that tbe first sentence is used with respect to the legislation specifically directing the refunding of the classes of taxes held to be unconstitutional and hence “illegally assessed,” and with which the court classes the particular taxes involved in the case under consideration, and if the act of 1912 is included in the reference we must revert for construction to the discussion of that particular act wherein it is discussed as involving a jurisdictional question and referred to as “ a law of Congress ” within the meaning of the Tucker Act, by virtue of which the United States consented to be proceeded against, for a limited time, in cases otherwise barred by limitation, and within which, for that purpose, was the case under consideration. If there were any doubt about the correctness of this view, it is dispelled by the citation of the Jones case, 236 U. S., 106. Action was brought in that case under section 3 of the act of 1902, which directed the refunding of so much of any taxes collected upon any legacy or distributive share of personal property as may have been collected on “ contingent beneficial interests which shall not have become vested prior to July first, nineteen hundred and two,” and the court held that the tax there in question “ was collected upon distributive shares which neither were nor could have been vested in possession or enjoyment prior to July 1, 1902,” and that “ there was no right of immediate possession or enjoyment at the time designated in the refunding statute.” The findings in this court from which the case was appealed show that the tax in question had been paid without protest. The question is eliminated from the case because .the taxes were determined to be within a class which Congress by the act of 1902 had specifically directed should be refunded. It was only necessary, in order to procure refundment, to establish the fact that they were within the class and that the claim had been filed within the time given. Having established those facts, the right to recover was founded on a “ law of Congress ” made to fit the particular case, and there was no duty to establish a right under the general statute.
Further in the quotation the court refers to the acts of 1907 and 1909, both dealing with taxes construed sis taxes *84 on exports and both directing refunder, and holds that the fact that words used therein as to protest are not repeated in the act of 1912 can not, “ in view of the nature of the subject,’' be regarded as evidencing a different intent. The “ nature of the subject ” was the same as in the acts referred to. The subject was another tax held to be a tax on exports and unconstitutional. That holding determined it not only to be of the same general nature as the other taxes referred to, but also determined it to have been illegal ab initio, as Congress had declared, following the Supreme Court, with reference to the other taxes, and there was, in fact, as said, no reason for imputing a different intent. “Rather,” it is then said, “must this act receive the same construction as that which has been given to the act of 1902.” Rather, that is to say, must this act, in so far as it relates to the classes of taxes under discussion, receive the construction put on the act of 1902 in the case cited as to that construction, the Jones case, and in fact the only case in which the construction is found, and that holding is to the effect that as to the particular taxes referred to in that act, refunder of which was directed, the question of protest was eliminated. The use of the words “ legally payable ” in the concluding sentence raises some question of doubt as to the reason therefor, since they are not “ express terms ” in any of the statutes under consideration. They are applicable in their probably intended meaning to the particular classes of taxes under consideration and held to be unconstitutional, and which, so far as appears, were exclusively in the mind of the writer. The subject matter of the decision and its intended scope are for consideration, and it is wholly unreasonable to assume that the court intended to embrace within the rule laid down all taxes provided for in the war-revenue act of 1898 and to run counter to a line of unquestioned decisions on the doctrine of protest and voluntary payment without reference to any of them. The Supreme Court does not disturb well-settled rules without definitely indicating its intention to do so and stating the reasons therefor. All the cases cited in this opinion are cited with approval and as authority and such as involve the question recognize the general rule as *85 to voluntary payments without protest and consider cases to be excepted therefrom. In the instant case the taxes in question were not of the classes held to be illegal because unconstitutional, and they were not within any of the classes directed to be refunded. Refunder is sought under the general statute, and in at least one view it is said in the Hvoslef case “ we are not concerned with questions arising under the general provisions of the internal-revenue laws.” The conclusion is certainly justified that the holding in this case does not apply to such questions.
Of significance in the discussion of this question from one angle is the case of United States v. Edmonston, 181 U. S., 500. It is a well-considered case frequently cited and would scarcely have been overlooked by the court in deciding the Hvoslef case if in the latter case it had been intended to establish a rule applicable to all taxes. The holding in the Edmonston case is entirely in accord with the view taken herein. In that case it is said:
“ The conclusion we draw from these cases (and no others in respect to the ruling of the Land Department are referred to) is different from that drawn by counsel. That Congress has power in all cases to waive the question of voluntary payment and provide that any mistake shall be corrected and any excess of payment refunded by the officer receiving it, or recovered by an action in the Court of Claims, is undoubted; that, as shown by these references, it has made provision in certain cases for a refunding by the department which has received the money is obvious; and provided for such refunding irrespective of the question of voluntary payment. Now, counsel would draw the inference that the question of voluntary payment has been waived by Congress in all cases of transactions between the Government through its administrative officers and private individuals except in customs cases, and that if there be no specific provision for refunding by the department in which the mistake has occurred the party may come into the Court of Claims and enforce his right to recover. Our conclusion is directly to the contrary, and that Congress, recognizing the rule of voluntary payment, believed that in certain instances it ought not to be enforced, and that the department which received money in excess of the legal charge or price should refund, and so legislated, intending to leave all other cases subject to ex *86 press statutory requirement of protest or to the ordinary and well-established rule as to the effect of voluntary payment.”
Some reference is made to language found in the second section of the act of 1912, authorizing the Secretary of the Treasury to pay to such claimants as have presented or shall hereafter so present their claims, and shall establish such erroneous or illegal assessment and collection any sums paid by them, etc. Its purpose seems quite apparent. It was not to broaden any right given or to relieve from any otherwise necessary requirement in the establishing of erroneous or illegal assessments, but was to permit the carrying into effect of a finding by the Commissioner of Internal Revenue that a tax had been erroneously or illegally assessed and collected by the repayment of the money so collected. Without authority to repay, a finding that one was entitled to repayment would be of little value. Money could not be withdrawn from the Treasury for purposes of repayment except by virtue of an appropriation or an authority equivalent to an appropriation. There was such an authority in the special refunding statutes which have been considered. For example, the act of 1902 directed the Secretary of the Treasury “ to pay out of any money in the Treasury not otherwise appropriated,” etc. All acts containing such a provision, or substantially such a one, had within them the authority to make them effective for the return of the money. Had the section in question been omitted from the act of 1912, there would have been no authority in the commissioner or the Secretary to actually pay the money back in cases arising under the general statute, as does the instant case, and a report to Congress for appropriation would have been necessary in case of allowance. The general statute finds its effectiveness in what is called a “ permanent annual ” appropriation. Revised Statutes, section 3689. It has been specifically held in the Treasury Department for nearly 40 years, the ruling having been promulgated in a departmental circular of December 14, 1877, that the appropriations made under this section are annual appropriations, and subject to the usual limitations on the use of such appropriations. The *87 statutory limitation is “two fiscal years,” and but for the section in question the very claim involved in this case, if it had been allowed by the Commissioner of Internal Revenue, must have been reported to Congress as an allowed claim to be appropriated for before payment could be made. In fact, the appropriation for the payment of claims, filed before January 1, 1914, under the act of 1912, for refunder, under the general statute, of taxes erroneously or illegally assessed and collected, is raised on the books of the Treasury Department by authority of the second section of the act of 1912, and not otherwise. In the necessity is found the reasons for the section, and they are the best possible guides as to its purpose and meaning.
The conclusions upon the two points discussed are either of them so decisive of this case that we regard it is unnecessary to discuss the question presented by counsel as to the validity of the assessment. The case must be dismissed, and it is so ordered.