181 U.S. 500 (1901)
UNITED STATES
v.
EDMONDSTON.
No. 353.
Supreme Court of United States.
Submitted April 8, 1901.
Decided May 13, 1901.
APPEAL FROM THE COURT OF CLAIMS.
*501 Mr. George Hines Gorman and Mr. Assistant Attorney General Pradt for the United States.
Mr. Harvey Spalding and Mr. E.W. Spalding for Edmondston.
MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.
On June 16, 1880, an act was passed, 21 Stat. 287, c. 244, in section 2 of which is the following clause:
"And in all cases where parties have paid double minimum price for land which has afterwards been found not to be within the limits of a railroad land grant, the excess of one dollar and twenty-five cents per acre shall, in like manner, be repaid to the purchaser thereof, or to his heirs or assigns."
Another act passed the day before, June 15, 1880, 21 Stat. 237, c. 227, contained this provision:
"The price of lands now subject to entry which were raised to two dollars and fifty cents per acre and put in market prior *502 to January, 1861, by reason of the grant of alternate sections for railroad purposes, is hereby reduced to one dollar and twenty-five cents per acre."
Medbury v. United States, 173 U.S. 492, arose under the clause first quoted, and it was held that it did not apply to lands which were in fact within the limits of a land grant, but which had been forfeited on account of the failure of the railroad company to build its road, but only to cases in which there had been a mistake in the first instance as to the location of the land, the court saying (p. 500):
"That act plainly referred to the case of a mistake in location at the time when the entry was made. Where the parties supposed that the land entered was within the limits of the land grant, and where subsequently it is discovered that the lands were not within those limits, that a mistake had been made, and that the party had not obtained the lands which he thought he was obtaining by virtue of his entry, then the act of 1880 applies.
"Here no mistake whatever has been made. The lands were within the limits of the land grant at the time of the entry, and so remained for many years and up to the time of the act of forfeiture by Congress."
The act of June 16, 1880, may, therefore, be put out of consideration. By the act of June 15, however, the price of this tract was reduced from $2.50 to $1.25 per acre. The claimant paid the $2.50 without protest or question. He paid more than the law required him to pay. Can he recover the excess in this action in the Court of Claims?
The question thus presented is one of difficulty. If the parties to the transaction were both private individuals, it would clearly be a case of voluntary payment, and the amount overpaid would not be recoverable. If, for instance, the owner of a large body of land placed certain prices on different tracts thereof, and his agent, dealing with a purchaser of one of those tracts, charged him more than the price fixed by the principal, the purchaser paying the extra price without protest, and the principal accepting such payment, the transaction would not thereafter be open to inquiry in the courts, and the purchaser *503 could not recover the extra sum which he had paid to the agent. But it is insisted that the relations between the government and its purchaser are not like those between two individuals  that there is a constraining power in the government, a species of force or compulsion in its action, which makes the payment of money by one purchasing land from it through its officers a payment not voluntary but an exaction, and therefore enables the purchaser to recover any excess in the price.
We may not enter into any discussion of the mere equities of this transaction or the extent of the moral obligation resting on the government to repay a purchaser an excess in the price charged to and received from him. Our inquiry is limited to the question whether, in the statutes conferring jurisdiction on the Court of Claims, Congress has intended to acknowledge the liability of the government to every individual who has paid to any one of its officers a sum in excess of the legal charge for property or services and given to that court the power to render judgment against it for such excess.
The consequences of such a conclusion are far-reaching. The administrative affairs of the government are carried on by many thousands of officers. The fees for their services are generally prescribed. The sums which are to be paid for property obtained from the government are in like manner fixed by statute. Can it be that every individual who pays for services rendered by any of the administrative officers of the government, or for property which he obtains through the action of such officers, may come into the Court of Claims, and have an inquiry whether he has paid more than the statutory fee or price, and if he has, obtain judgment for the excess? Suppose, for instance, the statutory fee for a certificate from a certain official is twenty-five cents, and a party applying for such certificate is charged and pays fifty cents, has Congress by its legislation in respect to the Court of Claims provided that he can go into that court and recover from the government the extra twenty-five cents? It may be said that this is an extreme case, and that the fee is for the personal services of the officer; but under the present provisions of the statutes, generally speaking, all fees for the services of officers belong to the government, and are available *504 only in payment so far as they go of their salaries. It may also be said that no one would go to the trouble of suing for such a trifle as twenty-five cents, but if there are 10,000 cases of that kind the aggregate is no inconsiderable sum. But whether the aggregate of these claims be large or small, the inquiry is fairly presented whether Congress by its legislation intended to commit to the courts a supervision of all the charges for services and all the prices for property which administrative officers collect and receive, and empowered them to render judgment against the government in every case of excess therein. Of course, if such was its purpose the courts cannot decline jurisdiction, and must act in compliance therewith. But before so holding it seems to us that that purpose should be clearly manifested, and that a doubt in respect thereto should be resolved in favor of the government.
By 24 Stat. 505, c. 359, § 1, jurisdiction is given to the Court of Claims over actions against the United States for 
"All claims founded upon the Constitution of the United States or any law of Congress, except for pensions, or upon any regulation of an executive department, or upon any contract, expressed or implied, with the government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort."
One contention is that there is an implied contract by the government to return to the payor any sum in excess of that which is legally due as the price of property, although the payment was made without any question, protest or notice.
No one can read the findings without recognizing that the transaction between the officials of the land office and the claimant was at the time acceptable to both and without any complaint on the part of the petitioner. Some stress is placed by counsel on the word "required" in the second finding, but we think that it means simply that the government officials charged him four hundred dollars. To that charge he made no objection. Take any case in which application is made to an official for services or for the purchase of property; when he names the fee or the price the applicant ordinarily without question pays it. In a certain sense the applicant is required to pay; *505 that is, the sum which he pays is the sum demanded of him. It may be a rightful or a wrongful demand. When it is demanded it is required. If he pays without objection, notice or protest it is simply in response to the call upon him for the particular sum, and, as we have heretofore said, between individuals it would be regarded as a voluntary payment.
Our attention has been called by counsel to certain opinions of this court, and some expressions therein, disconnected from the facts, doubtless lend countenance to their contention. Those cases may be placed in two classes: First, those in which something was purchased from the government which the purchaser wanted or must have; and, second, those in which some official of the government was called upon to return moneys he had received by virtue of his office. Swift Company v. United States, 111 U.S. 22, is an illustration of the first class. In that case the Swift Company sued to recover certain commissions alleged to be due on the purchase of proprietary stamps under the internal revenue law. It appeared that the company had settled with the internal revenue department from time to time, and it was held that such settlements did not bar it from its right to recover, although in making the settlements in controversy there was at the times thereof no distinct objection, notice or protest. It was contended by the government that the matter was closed by the voluntary action of the parties, but this court decided otherwise, predicating its decision upon the fact that there had been long-continued rulings of the department in respect to the basis of settlement, and that among those who had theretofore made frequent protests was William H. Swift, who upon the organization of the claimant company became one of its large stockholders and treasurer. It was held that the company was not compelled  in view of these repeated rulings, and after protests made by others engaged in the same business, including among the number one who was largely identified in interest with itself  to continue those protests at each settlement. In other words, the thought was that there was no magic in the mere formality of an objection at the time of each settlement; that when it appeared that parties engaged in like business had presented the question to the department and frequently protested *506 against its rulings, and that among them was one who was largely instrumental in the organization of the company, one of its large stockholders and its treasurer, it was a work of supererogation to every time repeat the formal protest. But the very line of argument pursued by the court implied the fact that there must have been some action by the party paying, or those connected with it in business; that the attention of the department had been called to the matter again and again, its action protested against, and still it insisted upon the ruling which it had made. The claimant in the case was held to be so far identified with the parties who had made protests as to be entitled to avail itself of the benefit of such protests. The language found in the opinion as to the difference in the position occupied by the government and a party dealing with it must be understood in connection with those facts. If taken otherwise, and in the broad sense which counsel desire, and as carrying with it the suggestion that there can be no voluntary payment in a dealing between the government and an individual in respect to the purchase of property from the government, we must decline to accede to it.
We quote from the opinion in that case, pages 27 and following, that which shows the facts as understood by the court, and the language upon which the contention is here made:
"It appears that prior to June 30, 1866, the leading manufacturers of matches, among whom was William A. Swift, who, upon the organization of the claimant corporation in 1870, became one of its largest stockholders and treasurer, made repeated protests to the officers of the Internal Revenue Bureau against its method of computing commissions for proprietary stamps sold to those who furnished their own dies and designs; although it did not appear that any one in behalf of the claimant corporation ever, after its organization, made any such protest or objection, or any claim on account thereof, until January 8, 1879. On that date the appellant caused a letter to be written to the commissioner, asserting its claim for the amount, afterwards sued for, as due on account of commissions on stamps purchased. To this, on January 16, 1879, the commissioner replied, saying that the appellant had received all *507 commissions upon stamps to which it was entitled, `provided the method of computing commissions, which was inaugurated with the first issue of private die proprietary stamps and has been continued by each of my predecessors, is correct. I have heretofore decided to adhere to the long established practice of the office in this regard until there shall be some legislation or a judicial decision to change it.' And the claim was, therefore, rejected.
"From this statement it clearly appears that the Internal Revenue Bureau had at the beginning deliberately adopted the construction of the law, upon which it acted through its successive commissioners, requiring all persons purchasing such proprietary stamps to receive their statutory commissions in stamps at their face value, instead of in money; that it regulated all its forms, modes of business, receipts, accounts and returns upon that interpretation of the law; that it refused on application, prior to 1866 and subsequently, to modify its decision; that all who dealt with it in purchasing these stamps were informed of its adherence to this ruling; and, finally, that conformity to it on their part was made a condition without which they would not be permitted to purchase stamps at all. This was in effect to say to appellant that unless it complied with the exaction it should not continue its business; for it could not continue its business without stamps and it could not purchase stamps except upon the terms prescribed by the Commissioner of Internal Revenue. The question is, whether the receipts, agreements, accounts and settlements made in pursuance of that demand and necessity were voluntary in such sense as to preclude the appellant from subsequently insisting on its statutory right.
"We cannot hesitate to answer that question in the negative. The parties were not on equal terms. The appellant had no choice. The only alternative was to submit to an illegal exaction or discontinue its business. It was in the power of the officers of the law, and could only do as they required. Money paid or other value parted with under such pressure has never been regarded as a voluntary act within the meaning of the maxim, Volenti non fit injuria."
*508 United States v. Lee, 106 U.S. 196, is not in point. The question there was as to the necessity of a tender on the day of sale in order to prevent the issue of a valid tax deed. The property was the Arlington estate, title to which was at the time in Mrs. Lee, and in respect thereto it was said (p. 204):
"It is proper to observe that there was evidence, uncontradicted, to show that Fendall appeared before the commissioners in due time and on the part of Mrs. Lee, in whom the title then was, offered to pay the taxes, interest and costs, and was told that the commissioners could receive the money from no one but the owner of the land in person."
It also appeared that the commissioners had laid down a rule to the same effect, and the court held, under those circumstances, that no further tender was necessary, quoting the general rule laid down in Hills v. Exchange Bank, 105 U.S. 319, as follows (p. 202):
"It is a general rule that when the tender of performance of an act is necessary to the establishment of any right against another party, this tender or offer to perform is waived or becomes unnecessary when it is reasonably certain that the offer will be refused."
Of course, this decision bears only remotely on what is or what is not a voluntary payment, and not at all upon the question whether there be any right of recovery in case of a voluntary payment.
The Bank of the United States v. The Bank of Washington, 6 Pet. 8, is even less in point. There it appeared that a judgment had been rendered against the Bank of Washington; that it sued out a writ of error, and ultimately obtained a reversal of the judgment; but that before it sued out such writ of error, and while the judgment was in full force, it paid the amount thereof to one having in his possession an execution, notifying him at the same time that it intended to take proceedings to reverse the judgment. It was held that notwithstanding such notice no recovery could be had by the Bank of Washington from the party who had the execution, he holding not as owner of the judgment but simply as agent to collect; that while upon reversal a recovery might be had from the judgment creditor, a *509 payment to this third party created no cause of action against the party so receiving.
On the other hand, in Lamborn v. County Commissioners, 97 U.S. 181, Lamborn, trustee for a land company, whose lands had been sold for taxes to the county of Dickinson, paid the amount of taxes to the county and took an assignment of the tax sale certificates. It was subsequently decided that the taxes were illegal, and thereupon he brought this action to recover the amount he had paid. When he made the payment and took the assignment he made no protest, and it was held that he could not recover, the payment having been voluntary, and made simply under a mistake of law. Many cases are cited in the opinion sustaining that proposition. To the same effect is Railroad Company v. Commissioners, 98 U.S. 541.
The other class of cases is illustrated by United States v. Lawson, 101 U.S. 164, and United States v. Ellsworth, 101 U.S. 170. In each of those cases it appeared that a collector had received certain fees, some of which he was entitled to retain, but all of which he paid into the United States Treasury upon the peremptory order of the Commissioner of Customs. This was held not to be a voluntary payment or sufficient to prevent a recovery of the moneys actually due him, the court saying, in the second of these cases (p. 173):
"You will bear in mind, said the commissioner, that all moneys of every description, not received by warrant on the Treasury, must be actually deposited. Had he added, if you fail to comply, the law will be enforced, his meaning could not be misunderstood, as the act of Congress provides that the gross amount of all moneys received from whatever source for the use of the United States, with an exception immaterial in this case, shall be paid by the officer or agent receiving the same into the Treasury at as early a day as practicable, without any abatement, etc. Rev. Stat. sec. 3617.
"Penalties are prescribed for noncompliance with that requirement, as follows: Every officer or agent who neglects or refuses to comply with that provision shall be subject to be removed from office and to forfeit any part or share of the moneys *510 withheld, to which he might otherwise be entitled. 14 Stat. 187; Rev. Stat. sec. 3619.
"Viewed in the light of these penal provisions, the payments in question made under the peremptory order of the commissioner cannot be regarded as voluntary in the sense that the party making them is thereby precluded from maintaining an action to recover back so much of the money paid as he was entitled to retain."
On the other hand, in United States v. Wilson, 168 U.S. 273, it appeared that a consul for the United States, in his regular accounts and settlements with the Secretary of the Treasury, charged himself with certain fees, received by him as consul, which he was not obliged to account for, and paid the same into the Treasury, retiring from office upon a final settlement without making any claim or protest concerning them, and it was held that he could not recover them, as they were voluntarily paid into the Treasury, the court saying (p. 276):
"There is no pretence that he paid the fees into the Treasury to avoid a controversy with any department of the government, or that he ever made any objection or protest against the fees being charged to him as official fees. The Court of Claims so finds in substance. If a voluntary payment can be made to the government, it seems to us that this is such a case, and unless it be declared that the law of voluntary payments is not applicable to the case of a payment by an official to the government, we think the payments made by the original claimant were voluntary. This is not a case of an order or direction for the payment of these moneys, given to Mr. Van Buren by the officers of the Treasury or State Departments; nor is it a case where the failure to pay the moneys might be regarded as a disobedience to the peremptory order of a superior officer; nor a payment under duress. The facts show nothing but a voluntary payment of money to the government without claim of any right to retain one penny of it."
It is clear from these references that this court has distinctly and constantly recognized the doctrine that where there has been a voluntary payment of money, using that term in its customary legal sense, the money so paid cannot be recovered, *511 and also that that doctrine applies to cases in which one of the parties is the government, and that money thus voluntarily paid to the government cannot be recovered.
We now proceed to notice some special objections of counsel for the appellee. One is that the defence of voluntary payment made in this case is exceptional and opposed to the entire policy of the government. Yet confessedly in all customs cases protest is necessary  made so by express statute. Counsel refer to Elliott v. Swartwout, 10 Pet. 137, 153, in which a reason for the necessity of protest was given as follows:
"To make the collector answerable, after he had paid over the money without any intimation having been given that the duty was not legally charged, cannot be sustained upon any sound principles of policy or of law. There can be no hardship in requiring the party to give notice to the collector that he considers the duty claimed illegal, and put him on his guard by requiring him not to pay over the money. The collector would then be placed in a situation to claim an indemnity from the government. But if the party is entirely silent, and there is no intimation of an intention to seek a repayment of the money, there can be no ground upon which the collector can retain the money, or call upon the government to indemnify him against the suit."
And upon that say:
"It is evident that customs cases are a class by themselves, and that the reasons which make a protest absolutely necessary in such cases have no application to other cases. The questions arising in the administration of the customs laws are so delicate, with such subtle shades of difference, that it is absolutely necessary that the Treasury have notice when one of its rulings is to be disputed, in order that the evidence may be preserved. This necessity has crystallized into positive law, regulating the form and time for filing protests, and creating a separate jurisdiction for the trial of such causes apart from other claims against the government."
But Elliott v. Swartwout was decided before there was a Court of Claims, and the specific reason stated in the quotation would not apply to an action brought directly against the government *512 in such court, and yet the necessity of protest is still affirmed by statute. So it cannot be said that the defence of voluntary payment is opposed to the entire policy of the government.
Passing from customs cases counsel refer to several instances in which the Interior Department has repaid money received under a mistake. Thus, in M.F. Soto, 6 Pub. Land Dec. 383, Secretary Lamar ordered, in respect to a series of cases, a return of the excess of moneys charged and received by the local land officers and paid into the Treasury of the United States. An examination of that decision shows that it was made under the act of June 16, 1880, heretofore referred to, which, in section 2, directed the repayment, and, in section 3, provided that 
"The Secretary of the Interior is authorized to make the payments herein provided for, out of any money in the Treasury not otherwise appropriated."
So, Congress having directed a repayment under conditions named in the statute, and authorized the Secretary of the Interior to make that repayment, the Secretary simply enforced the mandate of Congress.
In re Thomas Kearney, 7 Pub. Land Dec. 29, is to the same effect. It may be that the Secretary of the Interior misconstrued the law of June 16, 1880, as seems probable from our decision in Medbury v. United States, supra, but whether he did or no, his action was based upon that law. The same may be said of the case of Jacob A. Gilford, 8 Pub. Land Dec. 583.
In re Frank A. White, 17 Pub. Land Dec. 339, a case of desert land entry, is a decision that no repayment can be ordered in the absence of an express direction by Congress.
The case of Albert Nelson, 28 Pub. Land Dec. 248, referred to by counsel, is significant. In that case it was held that the repayment provisions of the act of June 16, 1880, did not authorize the Secretary of the Interior to draw his warrant upon the Treasury for double minimum excess erroneously charged for lands reduced in price by section 3 of the act of June 15, 1880, but that where the consideration received for the lands was in the form of scrip, still in the custody of the Land Department, *513 the error might be corrected by that department by a return of scrip equal in amount to the excess. That means simply that when a sale has not been closed by the payment of the consideration into the Treasury of the United States, and while the transaction is in process of administration and the consideration is still in the hands of the department charged with the duty of making the sale, it can correct a mistake in the amount of the consideration received, and that it is not necessary to turn the entire amount into the Treasury and leave the party to some other remedy directly against the government. But it does not follow therefrom that when the consideration has been paid into the Treasury and the power of the Secretary of the Interior to make any correction has ceased, a claimant may ignore the question of a voluntary payment, and maintain an action to recover the excess.
The conclusion we draw from these cases (and no others in respect to the ruling of the land department are referred to) is different from that drawn by counsel. That Congress has power in all cases to waive the question of voluntary payment and provide that any mistake shall be corrected and any excess of payment refunded by the officer receiving it, or recovered by an action in the Court of Claims, is undoubted; that, as shown by these references, it has made provision in certain cases for a refunding by the department which has received the money is obvious; and provided for such refunding irrespective of the question of voluntary payment. Now, counsel would draw the inference that the question of voluntary payment has been waived by Congress in all cases of transactions between the government through its administrative officers and private individuals except in customs cases, and that if there be no specific provision for refunding by the department in which the mistake has occurred, the party may come into the Court of Claims and enforce his right to recover. Our conclusion is directly to the contrary, and that Congress, recognizing the rule of voluntary payment, believed that in certain instances it ought not to be enforced, and that the department which received money in excess of the legal charge or price should refund, and so legislated, intending to leave all other cases subject to express statutory *514 requirement of protest or to the ordinary and well-established rule as to the effect of voluntary payment.
While the consequences of a construction are not conclusive, yet sometimes they are worthy of notice. If the jurisdiction of the Court of Claims is limited to cases in which the several departments have failed to recognize the direct mandates of Congress in respect to refunding, comparatively few cases will be brought into that court. It is to be assumed that the departmental officers will recognize all legislation of Congress, and carry it into effect in accordance with its terms, and, therefore, the only matters for judicial cognizance will be questions arising as to alleged misconstruction by such officers of its command, and the only judgments rendered against the government will be those in affirmance thereof; whereas, if the other construction is accepted, then, irrespective of any ruling by the department, without any mandate from Congress to refund, upon the mere fact of a supposed mistake in the fees charged or the price collected, although such fees or price were paid without question, the court will have jurisdiction of all actions to recover any alleged excess, and will be flooded with a multitude thereof. We know that even now that court is loaded with a volume of cases, prophetic of long delay, and if the door is to be opened so that all charges made by the government, through its officers, for fees or prices, irrespective of the question of voluntary payment, may be litigated therein, it is obvious that its docket will be so burdened that determination within ordinary limits of time cannot be expected.
Finally, we pass to a consideration of the question whether there is anything in the record to show that which is tantamount to objection and protest. We have not pursued the order of argument followed by counsel in their brief, but that which seems to us most natural to develop the questions involved herein. As indicated in the opinion in Swift Co. v. United States, supra, there are cases in which the formality of a protest or objection is unnecessary; some things may be taken as equivalent thereto or as sufficient in lieu thereof.
But we fail to see anything in the record which brings this case within the scope of that decision. It does not appear that *515 there was any continued or even a single ruling of the land department to the effect that land situated as was this was subject to the price of $2.50 per acre, and, of course, if there had been no ruling to that effect there had been no objection or protest by any one. Nor is there anything to show that the $2.50 was paid on any supposition that it was an excessive charge, or paid simply for the purpose of protecting a property right which he had acquired. It is said that as he had already gone upon the land and made improvements, that he paid $400 to protect his right to his settlement and improvements, and that he paid it because such price was exacted from him; but there is nothing in the record to indicate that he did not go upon the land in the first instance supposing that the price was $400, or that he did not file his declaratory statement, make his settlement and improvements  all with the expectation of paying the sum which he did thereafter pay. Under those circumstances it cannot be said that he paid a sum which was exacted from him  not because he believed it was the proper charge, but because he felt that it was necessary to protect his rights. In short, and to sum it up in a word, so far as we can see from this record the transaction was purely voluntary on his part, and that while there was a mistake it was mutual and one of law  a mistake on his part not induced by any attempt to deceive or misrepresentation by the government officials. It is a case of a voluntary payment, and as such the claimant's remedy is by appeal to the discretion of Congress and not by an action in the Court of Claims.
The judgment is reversed, and the case remanded with instructions to enter judgment for the Government.