## SUWANNEE STEAMSHIP COMPANY
### v.
## UNITED STATES.
### No. 397–55.

United States Court of Claims.
June 8, 1960.

Jones, Chief Judge, dissented.

Charles E. Channing, Jr., Washington, D. C., for plaintiff. Hugh Lynch, Jr., and Macleay, Lynch & Macdonald, Washington, D. C., were on the briefs.

Anthony W. Gross, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Leavenworth Colby, Washington, D. C., was on the brief.

MADDEN, Judge.

The plaintiff sues for $20,000 which, it says, the United States Maritime Commission collected from it, without legal authority.

Two ships, LSD–10 and LSD–11 were after World War II, declared surplus by the Navy and were certified to the Maritime Commission for sale. The Commission in 1947 advertised for bids. The advertisement required that bidders be citizens of the United States. Atlas Metals Corporation submitted a bid of $126,100 per ship. The bid was accepted and the ships were delivered to Atlas in 1948. Atlas was thereafter merged into National Petroleum Transport Corporation which agreed to be bound by all the conditions to which Atlas was bound.

On September 4, 1951, National Petroleum entered into an agreement to sell the ships to the plaintiff, Suwannee Steamship Company, for $215,000 per ship, the agreement being subject to the approval of the Maritime Administration, hereinafter called Maritime, which had succeeded to the functions of the United States Maritime Commission. An assumption agreement was made between the plaintiff and Maritime, dated October 4, 1951, by which Maritime consented to the transfer of the ships to the plaintiff, and the plaintiff agreed that it would, within 18 calendar months, either

(1) convert the ships in a United States shipyard for commercial operation, and document the ships under the laws of the United States, or (2) completely scrap the hulls of the ships within the continental limits of the United States. The agreement specifically stated that it was not to be construed as indicating that approval would be granted to any application for transfer of the ships to any foreign ownership, registry or flag, or to the operation of the vessels other than under American registry, unless operation otherwise was specifically approved by the Maritime Administrator pursuant to sections 9 and 37 of the Shipping Act of 1916, 39 Stat. 728, as amended, 46 U.S.C.A. §§ 808 and 835.

On January 24, 1952, the plaintiff applied to Maritime for approval of the sale of the two ships to Honduras Shipping Company, an affiliate of the plaintiff, and approval of the transfer of the ships to Honduran registry and flag. Maritime, on April 28, 1952, wrote the plaintiff as follows:

"This is to advise you that the Maritime Administrator under date of April 28, 1952, approved the placing of the subject vessels under Honduran registry and flag with ownership to remain in Suwannee Steamship Company and departure of the subject vessels from a United States Port or Ports, upon the following condition that prior to the issuance of formal Transfer Order evidencing such approval:

"(1) Suwannee Steamship Company pay to the Maritime Administration the sum of $10,000 per ship in consideration for the Maritime Administration's amendment of the contract resulting from its action of October 4, 1951, and releasing said Company from its obligation to document and operate said vessels under the laws of the United States;

"(2) Suwannee Steamship Company shall agree that said vessel shall be converted to railway car ferries in a shipyard within the United States;

"(3) That Suwannee Steamship Company and its sole stockholder, W. R. Lovett, shall furnish an Agreement guaranteeing that for the period of the National Emergency as proclaimed by the President on December 16, 1950:

"(a) Said vessels, whether owned by Suwannee Steamship Company or any subsequent transferee, shall, if requested by the United States or any qualified department or agency thereof, be sold or chartered to the United States on the same terms and conditions upon which a vessel owned by a citizen of the United States could be requisitioned for purchase or charter as provided in Section 902, Merchant Marine Act 1936, as amended, unless said vessels are lost or scrapped;

"(b) Said vessels shall not engage in operations prohibited to United States flag vessels under Department of Commerce Transportation Orders T–1 or T–2, or of any modification thereof, so long as they remain in force; and

"(4) In the event of any default under (2) and/or (3) hereof, the contracting parties shall pay to the Maritime Administration, Department of Commerce, as liquidated damages and not as a penalty, the sum of $25,000 lawful money of the United States of America, for each vessel involved in said default, said payment to be secured by a surety bond, or other surety satisfactory to the General Counsel of the Maritime Administration.

"Will you kindly indicate your acceptance of the above conditions so that appropriate documents may be prepared."

The plaintiff accepted the terms stipulated in the writing above quoted, which terms were in due course incorporated in formal documents, paid the $20,000 and, so far as appears, has subsequently done what it agreed to do.

■ The plaintiff's petition is based upon its contention that Maritime had no legal authority to condition its approval of the requested transfer upon the payment of $20,000. It has made a motion for summary judgment, asserting that there is no genuine issue as to any material fact.

The Government opposes the plaintiff's motion, saying that the plaintiff has failed to meet its burden of showing that there is no genuine issue of material fact. It says that the plaintiff has not proved its title to the vessels. It says:

"Whether the title of Atlas Metals Corporation and the unproved title of National Petroleum Transport Corporation were validly or fraudulently acquired depend upon the truth or falsity of numerous representations made by the said companies to the Maritime Commission. The record is devoid of any proof of the truth of those representations."

In its "Counter-Statement of Facts", the Government summarizes each of the transactions between the plaintiff, and its predecessors in title, and Maritime, and concludes several of these summaries with a statement such as "Whether the representations of plaintiff were true or fraudulent is not reflected by the record in this case."

We do not understand the Government's reason for injecting these numerous intimations of possible fraud. It filed an answer which contained no plea or intimation of fraud.

It has filed affidavits of officials of Maritime containing no allegations or intimations of fraud. Can it be the Government's position that no case is ever ripe for decision on a plaintiff's motion for summary judgment, since there lurks in every case at least one issue of fact, i. e., whether the plaintiff is a cheat and a scoundrel?

We think the case is in order for decision on the plaintiff's motion.

■ As to the legal merits of, the plaintiff's claim, the case is, in all materi-

al respects, like the case of Clapp v. United States, 117 F.Supp. 576, 127 Ct.Cl. 505, certiorari denied 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658. In that case this court held that the Maritime officials had no authority to exact a payment of $7,500 from a ship owner as a condition to his receiving permission to sell his ship to a foreign purchaser.

The Government urges that Maritime had the power to deny the plaintiff permission to make the desired transfer, and had, under section 41 of the Shipping Act of September 7, 1916, 46 U.S.C.A. § 839, complete freedom to impose conditions upon any permission granted. Section 41 says:

"Whenever by section 808 * * of this title the approval of the Commission (Administration) is required to render any act or transaction lawful, such approval may be accorded either absolutely or upon such conditions as the Commission (Administration) prescribes."

We suggest that no statute should be read as subjecting citizens to the uncontrolled caprice of officials, unless the statute has to do with the powers of the President in dealing with foreign relations, the powers of a military commander in the field, or some comparable situation.

The function of the officials of Maritime, in regard to the transfer of ships to foreign registry, is to consult with the other Executive authorities having to do with national defense, foreign relations, national economy, and perhaps others, and learn whether the transfer would be compatible with national interests. They should then consider the character of the applicant, and decide whether he can be trusted to do what he agrees to do, following the transfer. There are no doubt other matters, which do not occur to us, which they should consider. We have no doubt that the officials did their full duty, and considered all these subjects.

When they had considered them, their duty was to make up their minds to grant or deny the application. None of the things which were proper for their con-

sideration had the remotest relation to whether the applicant had, or did not have, $20,000 or whether, if he did have it, he could be induced to give it to the Government. If in fact the officials sold any percentage of our national defense, or our foreign relations, or our national economy for $20,000, they were guilty of a gross impropriety. If they had concluded, as they must have done, that the transfer would be consistent with the public interest, but had stated openly to the applicant that he would not get the permission unless he paid $20,000, that would have been more like horse-trading than carrying on public business of a high order of importance. The fact that the $20,000 requirement was not thus isolated, but was included in a writing along with several other properly imposed conditions does not change its nature.

The Government argues that this case is unlike Clapp because here the plaintiff had bound itself by contract to Maritime. We do not think this distinction is significant. The vice of the $20,000 is its irrelevance. There can hardly be a more serious defect in the carrying on of government than allowing matters which have nothing to do with the case to be dragged in, and to affect decisions. If the Government has valuable privileges to award, and if it desires to get money for them, it should, as it does in many situations, invite bids or negotiation. If it does not, its officials have no authority to add to their function of determining the compatibility of the application with the public interest, the supererogatory function of picking up a few dollars for the public treasury.

The Government, citing United States v. Edmonston, 181 U.S. 500, 21 S.Ct. 718, 45 L.Ed. 971, also contends that because the plaintiff here made the payment voluntarily and without protest, it is not entitled to recover it. We discussed a similar contention, and the applicability of Edmonston to such a situation, in Sprague Steamship Co. v. United States, Ct.Cl.1959, 172 F.Supp. 674, and concluded that, in order to give effect to the Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S.C.A.Appendix, § 1735 et seq., the doctrine of voluntary payment should not be applied. We hold the same view with respect to the Congressional purpose of the Shipping Act of 1916 here involved.

Our conclusion is, as it was in Clapp, supra, that the Government has in its treasury $20,000 which belongs to the plaintiff, and that the plaintiff is entitled to a judgment for that sum.

It is so ordered.

DURFEE, LARAMORE, and WHITAKER, Judges, concur.

JONES, Chief Judge (dissenting).

I dissent. Plaintiff applied to Maritime to secure foreign registration for its ships as provided for in the October 4, 1951, assumption agreement. The plaintiff was required to pay $20,000 in consideration of Maritime's approval of the transfer of its ships from American to foreign registry. Now apparently plaintiff has second thoughts about its bargain. I think plaintiff is estopped to deny the binding character of the agreement it freely entered into with Maritime. Fruhauf Southwest Garment Co. v. United States, 1953, 111 F.Supp. 945, 126 Ct.Cl. 51. To allow the plaintiff now to disavow its contract leaves it free to keep the benefit of the bargain and shirk the burden.

The argument is advanced that, questions of contract aside, Maritime has acted beyond its authority. On the basis of accumulated administrative expertise Maritime conditioned assent to a transfer of ships to foreign registration on the payment of $20,000. The action taken is consistent with an administrative policy designed to accomplish the broad aims declared by the Congress in the statute. The preamble to the statute asserts that Maritime has as its task "the purpose of encouraging, developing, and creating * * * a merchant marine to meet the requirements of the commerce of the United States with its Territories and possessions and with foreign countries

\* \* \*." Shipping Act of 1916, 39 Stat. 728. It would have been helpful if Maritime had clearly articulated the policy being implemented when it exacted the sum at issue.

These ships passed to private hands in the first place on condition that they be equipped in this country in order to give employment to American shipyards. Since the effect of foreign registry removes, at least for the time being, the plaintiff's obligation to equip and service its vessels in this country, Maritime resolved to charge it for going elsewhere. There is no doubt there was some additional time and expense involved in changing the arrangements and in providing for a retaking in the event an emergency should arise. I realize that Maritime is not a profit-making organization. But I do not believe the amount requested represented merely an ad hoc desire on the part of Maritime to enrich the public treasury. Maritime has the vital responsibility to insure that this nation possess an adequate, well-equipped, and competitive merchant marine. Maritime perhaps decided that American shipowners should be at least mildly discouraged from acquiring foreign registration for ships originally sold to private parties to strengthen the American merchant marine. I am satisfied that payment of the sum demanded served the ends of administrative policy. In the light of the generous discretion given to Maritime to condition approval in matters of this kind, 46 U.S.C.A. § 839, the action taken by Maritime was within the purview of the statute.

I cannot agree that the case of Clapp v. United States, 117 F.Supp. 576, 127 Ct. Cl. 505, certiorari denied 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658, is applicable here. The case is distinguishable on three grounds. In Clapp there was no contract; the Government predicated the payment solely on the statute. Secondly, the plaintiff protested the payment. Here the plaintiff willingly paid the amount requested. Thirdly, Clapp concerned the sale of a ship to a foreign purchaser although originally sale of the ship involved had been limited to domestic purchasers. We decided that the reasons for this restriction had vanished. Consequently, we saw no basis for making approval of the sale to a foreign purchaser contingent on payment of a sum of money. In the instant case there was a rational basis for the payment demanded.

Since I consider the payment which Maritime requested here to be entirely proper, I do not reach the question of whether a voluntary payment may be recovered, which was the controlling issue in United States v. Edmonston, 181 U.S. 500, 21 S.Ct. 718, 45 L.Ed. 971.