ROUGH DIAMOND COMPANY, Inc., and
A. G. Parser Incorporated
v.
The UNITED STATES.
No. 69–61.

United States Court of Claims.
Oct. 15, 1965.

Carl L. Shipley, Washington, D. C., attorney of record, for plaintiff. Shipley, Akerman & Pickett, Washington, D. C., of counsel.

Thomas J. Lydon, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

DAVIS, Judge.

In the spring of 1959, plaintiffs agreed with the Department of Agriculture to barter more than $6,600,000 worth of industrial diamonds for surplus cotton owned by the Commodity Credit Corporation (CCC). In this suit, they demand damages of $1,736,514.45, claimed to stem from the Department's refusal to exchange its cotton on the basis of the average world market value of cotton, rather than a higher price desired by CCC. Charging that the agency's actions contravened its statutory authority, plaintiffs sue for the money value of the additional cotton they say they should have received.

Congress, in 1954, authorized the Secretary of Agriculture to "barter or exchange agricultural commodities owned by the Commodity Credit Corporation for * * * such strategic or other materials of which the United States does not domestically produce its requirements * * * as the President may designate * * *." 68 Stat. 459, as amended, 7 U.S.C. § 1692. The statute also provided that the Secretary could "take reasonable precautions * * * to assure that barters or exchanges * * * will not unduly disrupt world prices of agricultural commodities or replace cash sales for dollars." Two years later, in an effort to stimulate lagging cotton exports, Congress directed the CCC "to encourage the export of cotton by offering to make cotton available at prices not in excess of the level of prices at which cottons of comparable qualities are being offered * * * by other exporting countries * * * [i. e., the world market price.]"[1] Agricultural Act of 1956, § 203, 70 Stat. 188, 199, 7 U.S.C. § 1853. Until the latter half of 1958, CCC sold and exchanged cotton at minimum prices substantially equal to world market rates. The agency's practice was to determine its prices in advance of each marketing year for cotton (which begins on August 1st and ends on July 31st), and to adhere to that pattern for the entire marketing year. In the fall of 1958, the rates established by CCC began to exceed those at which comparable grades of cotton were being offered by other countries. In keeping with its previous policy, however, the De-

---

[1]. Although there is no official publication giving the "world market price" of cotton, that phrase is frequently used in the trade as a short-hand reference to an average of prices in various foreign markets for one base type of cotton. Appropriate adjustments are made in pricing cottons of different quality and type. See finding 13.

partment did not revise its prices until August 1, 1959.

On December 24, 1958, CCC sent an announcement to the major dealers in industrial diamonds, inviting offers to exchange such materials for CCC agricultural commodities. Among the conditions stated were the requirements that the bartered commodities be exported, and that their sale be in addition to, rather than in replacement of, normal cash sales of CCC agricultural surplus. During the next month, plaintiffs Rough Diamond Company, Inc. and A. G. Parser, Inc., New York-based industrial diamond concerns, offered to exchange surplus diamonds valued at approximately $6,-700,000, in accordance with the specified conditions.[2] To be in a position to take advantage of the barter agreements which would follow acceptance of their offers, the plaintiffs made contingent arrangements with exporters for resale of the cotton.[3] These export agents agreed to purchase stipulated dollar amounts of government cotton at the CCC's going rate, in the event that the plaintiffs' bids were approved. After the execution of formal contracts by plaintiffs and CCC, the latter would refund the exporters' cash payments to plaintiffs. Under their agreements with the exporters, plaintiffs would in turn remit to them discounts based on the cost of exporting and reselling the cotton, as well as the disparity between the anticipated world market price and CCC's selling price during the 1958–1959 marketing year.

CCC conditionally accepted plaintiffs' principal offers on March 16, 1959, agreeing to the terms specified in the bids other than the proffered export deadline (December 31, 1959), which was set by the Department at an earlier date (July 31, 1959). On March 20th, Rough Diamond and Parser wrote similar letters to the Barter and Stockpiling Division of the Commodity Stabilization Service (CSS),[4] requesting in effect that the cotton be exchanged at the world market rate, rather than at the higher price the Department was then receiving. After their counteroffers had been repeatedly rejected, plaintiffs accepted the Government's terms and entered into agreements on that basis in late March and early April 1959. But when the contracts formalizing the agreement were to be signed in the fall of 1959, plaintiffs once again balked at Agriculture's cotton exchange rate, insisting on the world market prices. After fruitless attempts to negotiate an adjustment with the Department, plaintiffs executed the contracts under protest, and thereafter brought suit in this court.

A. The principal claim is that Section 203 of the Agricultural Act of 1956, supra, commanded the Government to barter the cotton for plaintiffs' diamonds at the world market price of cotton—and forbade any higher rate. As already noted, this section directed the CCC "to make [its] cotton available at prices not in excess of the level of prices at which cottons of comparable qualities are being offered * * * by other exporting countries * * *." The primary purpose of this part of the statute is stated in the legislation itself, which declares that, "Such quantities of cotton shall be sold as will reestablish and maintain the fair historical share of the world market for United States cotton, said volume to be determined by the Secretary of Agriculture." In attaining that goal, however, CCC was given some leeway, since it was also authorized to "accept bids in excess of the maximum prices specified herein [i. e., competitive world market prices]," although not permitted to "reject bids at such maximum prices unless

2. Both plaintiffs had accumulated large surplus diamond inventories, amounting to millions of dollars.

3. Each plaintiff voluntarily selected cotton out of the list of CCC agricultural commodities which were available for barter.

4. CSS, also a subagency of the Department of Agriculture, made the original diamond exchange offer on behalf of CCC and administered the sale of its cotton.

a higher bid is received for the same cotton." 70 Stat. 199, 7 U.S.C. § 1853.[5]

Passing over the Government's substantive defenses that Section 203 did not apply at all to barters and did not, in any case, preclude an averaging of the world market price over a three-year period, we concentrate on the plaintiffs' assumption that, once the court finds a violation of the statute, there is no escape from a judgment of recovery for them. This threshold postulate calls for inquiry. We can presuppose (without deciding) that the Department of Agriculture deviated from Section 203 when it pegged its cotton price above the current world level, but the probing question is whether that infringement should lead to an award of the additional monies paid by these purchasers for the CCC's cotton.

In a series of decisions growing out of the sale of government-owned vessels after World War II, this court held that buyers who had been charged more than the prices set by Congress could recover the excess, even though they had entered into contracts to pay those higher sums. A. H. Bull S. S. Co. v. United States, 108 F.Supp. 95, 123 Ct.Cl. 520 (1952); Southeastern Oil Florida, Inc. v. United States, 119 F.Supp. 731, 732–734, 127 Ct.Cl. 409, 411–412, 414 (1953), cert. denied, 348 U.S. 834, 75 S.Ct. 56, 99 L.Ed. 658 (1954); Clapp v. United States, 117 F.Supp. 576, 577–578, 581–582, 127 Ct. Cl. 505, 508–509, 513–515, cert. denied, 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658 (1954); Nautilus Shipping Corp. v. United States, 158 F.Supp. 353, 354–355, 141 Ct.Cl. 391, 394–395 (1958); Sprague S. S. Co. v. United States, 172 F.Supp. 674, 675–676, 145 Ct.Cl. 642, 645–647 (1959); Suwanee S. S. Co. v. United States, 279 F.2d 874, 877, 150 Ct.Cl. 331, 333 (1960). The holding was that the parties could not, by agreement, change the terms prescribed by the statute for the sale of the ships. This was said to be so even where the purchaser had freely agreed to pay the greater amount, and even though the maritime agencies could have withheld the ships from sale. Judgments were entered for the excess.

The Supreme Court had earlier been faced with a similar problem when a vendee of federal land paid considerably more than the statutory price for some acreage. The Court ruled that the overpayment was voluntary and the payer had no claim, cognizable in this court, for the extra. United States v. Edmondston, 181 U.S. 500, 21 S.Ct. 718, 45 L.Ed. 971 (1901). In the ship-sale cases, we distinguished Edmondston by stressing the difference in the underlying legislation. The maritime statutes, we thought, embodied the Congressional wish that "the

---

5. The statute reads in full: "Sec. 203. In furtherance of the current policy of the Commodity Credit Corporation of offering surplus agricultural commodities for sale for export at competitive world prices, the Commodity Credit Corporation is directed to use its existing powers and authorities immediately upon the enactment of this Act to encourage the export of cotton by offering to make cotton available at prices not in excess of the level of prices at which cottons of comparable qualities are being offered in substantial quantity by other exporting countries and, in any event, for the cotton marketing year beginning August 1, 1956, at prices not in excess of the minimum prices (plus carrying charges, beginning October 1, 1956, as established pursuant to Section 407 of the Agricultural Act of 1949) at which cottons of comparable qualities were sold under the expert program announced by the United States Department of Agriculture on August 12, 1955. The Commodity Credit Corporation may accept bids in excess of the maximum prices specified herein but shall not reject bids at such maximum prices unless a higher bid is received for the same cotton. Cottons of qualities not comparable to those of cottons sold under the program announced on August 12, 1955, shall be offered at prices not in excess of the maximum prices prescribed hereunder for cottons of qualities comparable to those of cottons sold under such program, with appropriate adjustment for differences in quality. Such quantities of cotton shall be sold as will reestablish and maintain the fair historical share of the world market for United States cotton, said volume to be determined by the Secretary of Agriculture."

Government's surplus ships should be sold at prices, uniform for all purchasers, and ascertainable by mathematical application of the statutory formula, properly interpreted"; this Congressional purpose "was strong enough to override any general legal doctrine, applicable in other situations, but which, if applied in the instant situation, would result in different persons paying different prices" for the same type of ships. In Edmondston, we said on the other hand, "the Supreme Court did not find a Congressional purpose that land should be sold at the prices fixed by statute sufficiently strong to overcome the general legal doctrine relating to voluntary payments made under mistake of law." Sprague S. S. Co. v. United States, supra, 172 F.Supp. at 676, 145 Ct.Cl. at 646–647. See, also, Suwanee S. S. Co. v. United States, supra, 279 F.2d at 877, 150 Ct.Cl. at 337. As this court saw it, the basic test in deciding whether a purchaser could recover would always be the particular Congressional will reflected in the particular piece of legislation under scrutiny: " * * * a court, in the application of a statute, cannot evade the task of ascertaining as best it can, and then giving effect to, the Congressional purpose." 172 F.Supp. at 676, 145 Ct.Cl. at 646.

Utilizing that basic yardstick, we seek the Congressional purpose of Section 203 as it bears on the right of these cotton-purchasers to recover a payment above the world market price. A capital contrast between the ship-sales statutes and Section 203 is that, in the former, Congress's establishment of the sale price-formula was evidently for the benefit of the purchasers themselves—the very persons who brought suit to regain the excess payments they had made or agreed to make. The class Congress had in mind comprised those who sought to enhance the country's merchant marine by buying surplus government vessels; they were to be helped by the sale of the ships at prices Congress considered fair and reasonable. In that way the American merchant fleet would be strengthened. The purchasers, potential and actual, were thus the direct beneficiaries of the legislative concern and interest. When they were charged more than Congress wished to have them pay, Congress would desire, the court felt, that *they* be reimbursed so that *their* ultimate price would not go beyond the moderate, uniform, level set by the statute. Recovery by the buyers of the excess would not be a windfall or unanticipated largesse, but rather a scaling down of the sale price to the maximum figure Congress wanted them to pay.

Section 203, on the contrary, was designed to benefit American farmers, not cotton exporters or merchants (like plaintiffs) who might seek to exchange cotton for diamonds (or other commodities). The goal of the provision was to aid the farmer by enabling more domestic cotton to be sold abroad; the device of ordering sales to be made at the world price was but a means of increasing the distribution of the American product for the benefit of the American grower. Congress was not concerned with the welfare of exporters or commodity dealers *per se,* nor would it be primarily interested in the price they would have to pay for CCC cotton. So long as the proper share of domestic cotton reached the channels of international trade, Congress would be satisfied. It would not care that the exporter or the diamond dealer had to pay more than the world price.

This Congressional regard for the producer, rather than the exporter, is manifest on the surface of Section 203. The Secretary of Agriculture is told to sell such quantities of cotton abroad "as will reestablish and maintain the fair historical share of the world market for United States cotton" (as he determines it to be). This build-up of exports would be accomplished, Congress expected, by "encourag[ing] the export of cotton by offering to make cotton available at prices not in excess" of the world level. But as if to indicate that the increase in exports was its central concern, not the price at which the cotton was sold, Congress simultaneously provided that the CCC "may accept bids in excess of the maxi-

mum prices specified herein [the world market price] but shall not reject bids at such maximum prices unless a higher bid is received for the same cotton." Provided that the cotton was sold, the CCC could lawfully obtain any amount the buyer was willing to give. The important thing was to expand exports so that, ultimately, the domestic farmers could receive a better and less costly return for their production.

The same notes were sounded in the Congressional debates. Section 203 was a composition of the Senate committee, after the bill (H.R. 10875) had passed the House. S. Rept. No. 1966, 84th Cong., 2d Sess., pp. 2, 7; 102 Cong. Rec. 8350–1.[6] The provision permitting sales above the world price (under defined conditions) was not included in the Committee's version of the section but was added on the floor. Nevertheless, the Committee's report emphasized the end of sales-expansion (as distinct from the means of sale at the world price) by observing that "[s]uch quantities [of cotton] would be required to be sold as would reestablish the United States fair share of the world market." S. Rept. No. 1966, supra, at 2, U. S. Code Cong. & Admin. News 1956, p. 2558. In initially sponsoring Section 203 (before the proviso was added), Senator Ellender also stressed the need to increase exports: "The experience of recent weeks demonstrates that only nominal amounts of cotton will be sold under the present export program. Competitive pricing is the key to increased cotton exports, and American cotton must be permitted to move freely into world trade." 102 Cong. Rec. 8347. Immediately after

the proviso was first adopted,[7] Senator Eastland said: "The charge has been made that the bill places a ceiling on the price at which cotton can be sold. That criticism is eliminated by the amendment." 102 Cong. Rec. 8484. And he voiced his concern that "the American cotton *farmer* be permitted to sell on a competitive basis * * * so as to enable us to retain a fair share of our export business", anticipating the reestablishment under the new measure of "the historic share of the American export cotton market for the American *farmer* * *." Ibid. (emphasis added).[8] Other Senators expressed a similar concern with the impact on the farmer of then-current cotton export policies and the necessity, from the cotton-growers' viewpoint, to expand exports. 102 Cong. Rec. 8485 (Sen. Young); 8486–8487 (Sen. Stennis); 8488 (Sen. Goldwater). In accepting Section 203, the House conferees likewise emphasized that the goal was the recapture of our portion of the world market: "It is hoped that the Secretary can regain the historical American share of the world market without unnecessarily lowering the level of world prices for cotton, and it is not intended that he shall be required to drastically reduce the price of cotton far below the level of prices received at the sale announced August 12, 1955. On the other hand it is intended that he shall have ample authority to reduce prices to whatever level he finds necessary to accomplish this result." H. Rept. No. 2197, 2d Sess., U. S. Code Cong. & Admin. News 1956, p. 2580 (reprinted at 102 Cong. Rec. 8822).[9] The same theme of the need to expand exports in

---

6. A provision like Section 203 had been added by the Senate to an earlier agricultural measure passed in 1956 (H.R. 12), but was deleted by the conference committee. 102 Cong.Rec. 6124. This bill was vetoed and never became law. 102 Cong.Rec. 8347.

7. The proviso was subsequently revised and readopted, at the request of the Agriculture Department, to read as it now does. 102 Cong.Rec. 8502–03.

8. In an analysis of the proposed Section 203, Senator Eastland also pointed out

that the provision did not "preclude the Commodity Credit Corporation from accepting the higher of several bids for the same particular lot of cotton above the [August 12, 1955] price." 102 Cong.Rec. 8485.

9. Senator Eastland agreed that the statement of the Managers on the part of the House reflected the position of both branches of the Congress. 102 Cong.Rec. 8678.

order to help the domestic grower was repeated when the House accepted the conference report. 102 Cong. Rec. 8826–8827 (Rep. Poage).

■ Throughout the consideration of Section 203, the main objective was to sell a fair share of American cotton. If that could be done only at the going world price the Secretary was to proffer the cotton at that rate, but if enough sales could be made at a higher level Congress did not forbid receipt by the CCC of the increment. There were, of course, references in the debates to the world rates as the prices the Agriculture Department would charge (see, e. g., 102 Cong. Rec. 8347, 8483–8487), but the presupposition always was that this was the means by which this country would regain its "historical share" of the cotton market. The prices were not the end in themselves.

■ From all of this we infer that the driving force behind Section 203 was to give a benefit to the farmer through increased exports—not a direct concern with the prices paid by cotton exporters or barterers. To allow these plaintiffs to recover the excess over the world price (assuming that the Agriculture Department departed from the statute by insisting on a higher minimum) would not be to give them the price Congress wanted *them* to pay but, rather, would permit the purchasers to reap a benefit which Congress gave no indication of wanting them to have for themselves. The beneficiaries on whom Congress focussed were another group altogether. For the same reason, it would not advance the Congressional goal to reduce, in 1965, the price these plaintiffs paid for their cotton in 1959—as it helped to fulfill the aim of the ship-sale statutes for this court to lower, through the ship-sale litigation, the prices paid by those plaintiff-purchasers for their vessels.

■ The result is that these exporters and barterers are in the position of individuals affected by a statute without being granted litigable rights under it because it was not enacted for their advantage. Cf. Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940); United States v. Binghamton Constr. Co., 347 U.S. 171, 176–177, 74 S. Ct. 438, 98 L.Ed. 594 (1954). As persons outside the circle of beneficiaries Congress drew for Section 203, purchasers of CCC cotton are bound by the traditional rules precluding recovery of monies voluntarily paid to the Government under mistake of law (United States v. Edmondston, supra), and holding contractors to the prices they have agreed to pay for federal merchandise (even though they might have obtained better terms by following other routes). See American Smelting & Refining Co. v. United States, 259 U.S. 75, 78–79, 42 S.Ct. 420, 66 L.Ed. 833 (1922); Matson Navigation Co. v. United States, 284 U.S. 352, 357–358, 52 S.Ct. 162, 76 L.Ed. 336 (1932); Parish v. United States, 8 Wall. 489, 490, 19 L. Ed. 472 (1869). Any protests plaintiffs may have uttered at the time of or after they closed the bargain cannot alter the effect of their voluntary agreements to exchange their diamonds at the CCC price for cotton. See American Smelting & Refining Co. v. United States, supra, 259 U.S. at 79, 42 S.Ct. 420; United States ex rel. International Contracting Co. v. Lamont, 155 U.S. 303, 309–310, 15 S.Ct. 97, 39 L.Ed. 160 (1894); Gilbert & Secor v. United States, 8 Wall. 358, 359, 360, 361, 19 L.Ed. 303 (1869); Parish v. United States, supra.[10]

It is particularly appropriate that these plaintiffs be bound by the pacts they made in full awareness. The eye of their interest was not the export price of CCC cotton but the disposal of their stocks of industrial diamonds for dollars. They knew from the outset that the Department's price for cotton exceeded the world level; their arrangements were initially made on that basis; and, in the begin-

---

10. We say nothing, because it is not before us, on the related but separate issue of whether plaintiffs would have had sufficient standing to sue in 1959 for manda- tory or injunctive relief compelling the Secretary of Agriculture to offer the cotton to them at the world price.

ning, they plainly entered into the exchange on the Department's price terms. They did, thereafter, request that the barter be at the world market price, but when the Government refused they nevertheless confirmed (in effect) the existing informal agreements although they could have withdrawn at that stage without incurring any statutory or contractual penalties. As detailed in Part B of this opinion, infra, they were not misled by the Government or subjected to economic duress. On the contrary, they were so anxious to complete the barter (in order to dispose of their diamonds) notwithstanding the less favorable exchange rate that they in fact proceeded, and would in any event have proceeded, with the transactions despite the Department's policy. They never expected to make any profit on the cotton part of the barter; the cotton was simply an intricate device for converting their diamonds into dollars. They could just as well have selected others of the many CCC-commodities which the Agriculture Department was offering for barter. Unlike the shipbuyers with whom this court dealt in the earlier cases, purchasers of plaintiffs' type can hardly say that Congress clearly intended, through Section 203, that they should be charged no more than the world market price for cotton even though they had freely agreed with the Government to pay more.[11] Section 203, in other words, did not override the general legal doctrines applicable to monetary suits by those who have voluntarily purchased property from the Government.

B. Plaintiffs seem to argue alternatively that, in any event, the contracts should be reformed to reflect a cotton exchange rate based on the world market price because these agreements resulted from misrepresentation and coercion by the Government. They contend that they would have abandoned the nego-

tiations had they not been misled into believing they might be able to exchange their diamonds for cotton priced at competitive world rates. But, as we have already indicated, the trial commissioner has found that "plaintiffs were so anxious to dispose of their large surplus diamond inventories * * * that they would have proceeded with the transactions in any event." Finding 41. In effect, the commissioner determined that plaintiffs were intent on completing the barter notwithstanding a less favorable exchange rate, and that they did not rely on allegedly misleading government statements concerning that rate. Although the plaintiffs challenge this ultimate finding, they do not attack any of the commissioner's preliminary findings which lead up to his conclusion, i. e., that plaintiffs were well aware of the disparity between world market prices and the floor price for CCC cotton (finding 11); that they made their initial offers and arranged to pay substantial discounts to cotton exporters on the basis of the higher rate (findings 11, 12, 13, 16); and that they were concerned to dispose of their surplus diamonds even though they suffered such ostensible losses (finding 11).

We think that the defendant made no misrepresentations, and that even if Rough Diamond and Parser were temporarily misled by the statements in question they did not rely thereon to their detriment. On February 3, 1959, officials of the Department of Agriculture testified in hearings before a House subcommittee on appropriations, at which the Department was severely criticized for allegedly failing to comply with Section 203 during the 1958–1959 marketing year. The chairman of the subcommittee stated explicitly that he thought the pricing policy for 1958–1959 violated the statute. In the next two days, the Department of Agriculture issued press releases announcing changes in the CCC's

11. In South Puerto Rico Sugar Company Trading Corp. v. United States, Ct.Cl., 334 F.2d 622, decided July 17, 1964, cert. denied, 379 U.S. 964, 85 S.Ct. 654, 13 L. Ed.2d 558 (1965), the plaintiff was one of the group intended to be benefited directly by the portion of the statute on which it relied; in addition, true business compulsion was also found to be present.

cotton export program for the 1959–1960 marketing year (beginning August 1, 1959). The revisions were designed to enable CCC to sell its cotton at world market prices. On the basis of these statements, plaintiffs apparently concluded that there was a strong possibility that, even prior to the end of the 1958–1959 marketing year, CCC would lower its cotton export prices. See finding 21. But it is difficult to see anything misleading about either the hearing-testimony or the subsequent press releases. At no time did the Department state that it would modify its cotton prices prior to July 31st, although such an inference might possibly be drawn from admissions at the hearings by representatives of the Department that the pricing policy for 1958–1959 had gone somewhat awry. See findings 15, 17. This is, however, far short of the "clear and convincing" evidence of misrepresentation necessary for the reformation of a contract. Associated Traders, Inc. v. United States, 169 F.Supp. 502, 505–506, 144 Ct.Cl. 744, 749–750 (1959). Plaintiffs simply drew their own inferences from official statements which were, at most, ambiguous and murky.

Even if these pronouncements were misleading, Parser and Rough Diamond could not possibly have relied on them. On March 16, 1959, CCC "accepted" plaintiffs' offers, but varied the terms by specifying an earlier export deadline.[12] While plaintiffs had proposed to export the bartered cotton by December 31, 1959, CCC stipulated that all cotton be exported on or before July 31, 1959. Since plaintiffs had made extensive commitments with cotton brokers based on rates above the world market level, it can be assumed that they did not originally consider the world market price to be essential or the later deadline to be a means of obtaining that price. But as a result of the press releases in February 1959, plaintiffs

knew that, as of August 1, 1959, CCC would lower its prices to approximately the going international rate. The selection of the export deadline then became important because it could permit the purchase of the CCC cotton at the lower rate. On March 20th, plaintiffs tendered counteroffers, requesting that the deadline be set forward to March 16, 1960, or, alternatively, that cotton received in exchange from CCC prior to July 31, 1959, be valued "in accordance with Section 203 of the Agricultural Act of 1956" (by which plaintiffs meant current world market prices). On the very same day, however, Parser sent a "confirmation" (acceptance) letter, agreeing to exchange diamonds valued at $135,000 on CCC's terms. At conferences with Department of Agriculture representatives on March 24th, 25th, and 26th, and April 3rd, plaintiffs' proposals were rejected. Findings 22, 23(d), 24, and 25(a). Moreover, plaintiffs were told at these meetings that to be considered, their revised offers would have to be treated as new ones and placed at the bottom of the list, since offers were passed on in the order in which they were submitted. This might mean losing out entirely on the barter, because CCC had received numerous offers. Wanting to avoid such a result at all costs, plaintiffs agreed to make the exchanges on the basis of the then prevailing rate for CCC-owned cotton. In a letter dated March 25th, Parser "confirmed" (accepted) the part of the defendant's March 16th offer it had left open by its earlier confirmation, and Rough Diamond followed suit on April 6th. Apparently because they had accepted these terms, plaintiffs never replied to a letter from CCC on April 8th, formally reiterating the agency's rejection of plaintiffs' counteroffers.

Plaintiffs now claim that CCC intentionally timed its formal reply of April 8th so that it would arrive after the

---

12. CCC's telegram of March 16th to Rough Diamond "accepted" that firm's offer to barter surplus diamonds valued at $4,740,-000. The acceptance telegram sent to Parser on the same day pertained to only two of its four bids. Parser's remaining offers were accepted by CCC in April and May 1959, bringing the total value of the diamonds exchanged by that company to $1,870,000.

specified deadline for acceptance of the agency's barter offers. As a result, it is said, CCC deceived them into thinking their alternative proposals might still be accepted, even after plaintiffs had agreed to less favorable terms. But the meetings of March 24–26th and April 3rd, at which government officials flatly rejected plaintiffs' counteroffers, can have left no doubt on this score. Before Rough Diamond and Parser accepted the defendant's terms, they had already been told quite specifically that there was no hope for a better cotton exchange rate at that time. Plaintiffs accepted the higher rates with full knowledge of the surrounding circumstances and were in no way deceived when they acquiesced in CCC's terms.

Plaintiffs argue also that they consented to the terms stated in the Government's acceptance letter of March 16, 1959, in order to avoid the imposition of severe fines by the defendant. Assuming that reformation is an appropriate remedy (rather than rescission, which plaintiffs definitely do not desire), they have failed to prove their case. There is no evidence of duress. First, the CCC rules then in effect seem to us to make it clear that prospective barterers were not subject to any penalty *prior* to their confirmation of the acceptance letters. See findings 19(a), 28; tr. 833–38. Even if the rules had so provided, they were published and plaintiffs would have been on notice as to any sanctions specified for the withdrawal of an offer. Perhaps most significant is the absence of a scintilla of evidence that plaintiffs were concerned with the question of possible penalties if they backed out after March 16th. The record contains no indication that either Rough Diamond or Parser made any inquiries in this regard before submitting their confirmations. Plaintiffs' main concern at that time was still to dispose of the surplus diamonds for which there was no other market. Even

if their prior enthusiasm had diminished somewhat, plaintiffs remained anxious to complete the barter transactions and were not coerced into doing so.

In the fall of 1959, plaintiffs were asked to sign contracts formalizing the agreements reached in March and April. When they refused, seeking the better exchange rate, CCC did "threaten" to impose fines if plaintiffs backed out of the deal. See finding 51. By that time, plaintiffs were already bound by their prior acceptances, in the spring, of CCC's offers. See Restatement, Contracts § 26; Hunt & Willett, Inc. v. United States, Ct. Cl., 351 F.2d 980, decided Dec. 11, 1964.[13] The Government's offers had incorporated by reference certain sanctions which could be invoked by CCC if the private party accepted the offer and then subsequently breached the resulting barter agreement. See findings 18, 19. By suggesting that it might employ such sanctions, the defendant was not guilty of duress. It was saying no more than it would be free to exercise its legal rights. See, e. g., Electric Power Plants Corp. v. United States, 173 F.Supp. 615, 616, 146 Ct.Cl. 98, 100 (1959); Beatty v. United States, 168 F.Supp. 204, 206–207, 144 Ct. Cl. 203, 205–207 (1958). In short, plaintiffs were neither coerced nor misled. The end result of the negotiations was plaintiffs' acceptance, in the spring of 1959, of a cotton exchange agreement based on prevailing CCC prices for the 1958–1959 marketing year. Having voluntarily agreed to these terms, Rough Diamond and Parser got what they ultimately bargained to receive, and they are entitled to no more. Cf. Austin Co. v. United States, 314 F.2d 518, 520, 161 Ct. Cl. 76, 80–81, cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963); Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 778, 160 Ct.Cl. 437, 445 (1963).

Plaintiffs are not entitled to recover, and their petition is dismissed.

13. Though the informal agreement was "subject to the execution by the parties of a mutually agreeable contract containing all of the terms and conditions," that did not alter its binding effect.