**AEROLINEAS ARGENTINAS,**
**Plaintiff–Appellant,**

**and**

**Pakistan International Airlines,**
**Plaintiff–Appellant,**

**v.**

**The UNITED STATES, Defendant–**
**Appellee.**

Nos. 94–5076, 94–5077.

United States Court of Appeals,
Federal Circuit.

Feb. 28, 1996.

Jay Henry Levine, Bigham Englar Jones & Houston, of New York City, argued for plaintiff-appellant, Aerolineas Argentinas. Mumtaz H. Alvi, Las Offices Muntaz H. Alvi, of New York City, and Elan Gerstmann, of New York City, were on the brief, for plaintiff-appellant, Pakistan International Airlines.

Thomas D. Dinackus, Attorney, Commercial Litigation Branch, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director and Jeanne E. Davidson, Assistant Director. Also on the brief was Ian G. Hinds, Assistant General Counsel, Immigration & Naturalization Service, of counsel.

Before NEWMAN, Circuit Judge, NIES, Senior Circuit Judge,* and MAYER, Circuit Judge.

Opinion for the court filed by Circuit Judge NEWMAN. Separate opinion, concurring, filed by Senior Circuit Judge NIES.

PAULINE NEWMAN, Circuit Judge.

Aerolineas Argentinas (Aerolineas) and Pakistan International Airlines (PIA) each filed suit in the Court of Federal Claims to recover money that the Immigration and Naturalization Service (Service or INS) required the airlines to pay to house, sustain, and guard aliens who, having arrived in the United States on plaintiffs' airlines without entry documents, sought political asylum. The airlines state that in view of the enactment of the 1986 Immigration User Fee Statute and the repeal of Immigration and Naturalization Act (INA) § 233, 8 U.S.C. § 1223, the Service, not the airlines, is required to bear the expense of long-term detention and maintenance of aliens pending resolution of their asylum requests. The Court of Federal Claims dismissed these consolidated suits [1] for lack of jurisdiction or for failure to state a claim on which relief may be granted. We vacate the dismissal, for the plaintiffs have stated a claim within the court's Tucker Act jurisdiction. On review of the applicable law, we conclude that the plaintiffs are entitled to recover the sums for which payment was illegally exacted by the government.

---

* Judge Nies assumed Senior Judge status on November 1, 1995.

1. *Aerolineas Argentinas v. United States, Pakistan International Airlines v. United States,* 31 Fed.Cl. 25 (1994).

## A. POLITICAL ASYLUM

The aliens whose requests for political asylum underlie this action arrived in the United States as passengers on the plaintiff airlines, and were excludable from entry on two grounds: either because their travel documents permitted only transit through the airport in continuing travel to a foreign destination, or because they presented no valid travel documents upon arrival at the United States port. INA § 212(a)(7)(B), 8 U.S.C. § 1182(a)(7)(B). Other classes of excludable aliens are not involved in this action. *See generally* INA § 212(a), 8 U.S.C. § 1182(a) (defining excludable aliens).

█ Authorized air carriers may transport aliens through airports in the United States, but only in "immediate and continuous transit" to another country. *See* INA § 212(d)(4)(C), 8 U.S.C. § 1182(d)(4)(C); 8 C.F.R. §§ 212.1(f)(1), 214.2(c)(1). This program is called "transit without visa" (TWOV). An airline that wishes to participate in the TWOV program must sign INS Form I-426, entitled Immediate and Continuous Transit Agreement, which states the carrier's rights and obligations with respect to transit passengers. INA § 238(c), 8 U.S.C. § 1228(c); 8 C.F.R. § 238.3. Aerolineas and PIA participate in the TWOV program and have signed Form I-426. *See* 8 C.F.R. § 238.3(b) (listing signatories of Form I-426 agreements). When a United States immigration official discovers that an alien does not qualify for TWOV status, unless political asylum is requested the Service may order immediate deportation and require the carrier to (1) return the alien to the port of embarkation in accordance with Form I-426 ¶ 5, (2) pay $500 to the United States as liquidated damages as specified by Form I-426 ¶ 7, and (3) pay a fine that is now $3,000. *See* INA § 273(b), 8 U.S.C. § 1323(b); INA § 237(a)(1), 8 U.S.C. § 1227(a)(1).

█ Deportation is stayed when political asylum is requested. The United States adheres to the United Nations Protocol Relating to the Status of Refugees, *opened for signature* Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267, implemented by the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102 (1980). In accordance with the Refugee Act an alien is permitted to request political asylum "irrespective of such alien's status" if the alien is already present in this country:

> The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

INA § 208(a), 8 U.S.C. § 1158(a). The Attorney General's discretion is exercised through a hearing process. *See Garcia–Mir v. Smith,* 766 F.2d 1478, 1483–84 (11th Cir. 1985), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986) (excludable aliens have no constitutional right of entry). After enactment of INA § 208, 8 U.S.C. § 1158, all aliens who reach the United States as TWOV passengers or as stowaways are entitled to apply for asylum, and to the ensuing hearing process. During that process excludable aliens are ordinarily detained in federal custody. For all aliens except TWOV passengers and stowaways the Service has accepted the custodial responsibility for that detention.

In the incidents giving rise to this litigation aliens without entry documents arrived on Aerolineas or PIA scheduled flights and requested political asylum. Some of these passengers had destroyed their travel documents en route, and thus were treated as stowaways. Others arrived as TWOV passengers, and yielded their TWOV status by requesting asylum. The Service declined to assume custody of these aliens, but issued written detention orders directing Aerolineas or PIA to detain and maintain the aliens at the airline's expense pending completion of the asylum hearings. The adjudication of an asylum claim can be a lengthy process. *See* 59 Fed.Reg. 14,779, 14,780 (1994) ("most asylum applicants wait a year or more to receive even initial decisions on their cases").

Several instances of alien detention and their cost are described in the complaints. The airlines paid the cost of hotel rooms,

meals, twenty-four hour security guards, and medical and other expenses, until completion of the asylum procedures and either admission or deportation of the alien. For example, the Aerolineas complaint describes an April 27, 1990 flight to New York carrying six passengers having Singapore or Malaysia passports and connecting tickets to Hong Kong. The immigration officer determined that the passports were fraudulent. The passengers said they were nationals of the People's Republic of China and requested political asylum. The Service ordered Aerolineas to detain them. The cost to the carrier is stated as $162,000.

Similarly, the PIA complaint describes a November 10, 1988 flight to New York carrying a passenger who had no travel documents on arrival, having destroyed them in flight. The Service classified him as a stowaway. The passenger requested asylum, and the Service ordered PIA to detain him. He remained in PIA's custody until May 3, 1989, at a cost to PIA of $89,340.54.

For the incidents described in the complaints the airlines requested that the Service take custody of the detained aliens, stating that the statutory change in 1986 so required. Upon rejection by the Service of these requests PIA and Aerolineas complied with the detention orders, and duly filed suit in the Court of Federal Claims requesting recovery from the government of the amounts spent.

## B. THE 1986 IMMIGRATION USER FEE STATUTE

Before 1986 the statutory authority for requiring the airlines to pay the cost of detaining excludable aliens pending political asylum proceedings provided that:

(a) Upon the arrival at a port of the United States of any vessel or aircraft bringing aliens ... the immigration officers may order a temporary removal of such aliens for examination and inspection.... A temporary removal of aliens from such vessels or aircraft ... shall be made by an immigration officer at the expense of the vessels or aircraft or transportation lines....

(b) Whenever a temporary removal of aliens is made under this section, the vessels or aircraft or transportation lines which brought them ... shall pay all expenses of such removal to a designated place for examination and inspection ... and all expenses arising during subsequent detention, pending a decision on the aliens' eligibility to enter the United States....

INA § 233, 8 U.S.C. § 1223 *repealed by* Pub.L. No. 99–591, § 206, 100 Stat. 3341–56 (1986). The regulation that implemented this practice, 8 C.F.R. § 235.3(d), cited INA § 233 as its statutory authority.

After enactment of the Refugee Act of 1980 the airlines increasingly found themselves providing long-term detention of aliens seeking asylum. In 1985 Congress expressed its disapproval of placing upon the airlines the responsibility for "jailing" of aliens. In a report that addressed this concern, the House Appropriations Committee stated:

The Committee believes this policy raises significant questions about the equity and legal propriety of requiring private entities to assume the financial burdens of maintaining and, at times, exercising physical custody over excludable aliens for extended periods of time. Specifically, the Committee is concerned about the possible ramifications of detention of aliens by airline personnel or their agents who are not, of course, law enforcement officials.

H.R.Rep. No. 197, 99th Cong., 1st Sess. 38 (1985). The following year the Committee repeated its concern:

Last year the Committee expressed concern about the policy of the INS, which requires scheduled passenger airlines to assume custody and financial responsibility for aliens who arrive by plane in the United States without proper documentation. Specifically, the Committee expressed concerns about the possible ramifications of requiring air carriers, who are not, of course, law enforcement officers, to detain such aliens in hotels and motels. The Committee wishes to reiterate concern over this policy and notes its strong support for a change in policy which would require the INS to assume, in all cases, all

custodial responsibility and financial responsibility when the transporting air carriers have demonstrated a good faith effort to detect inadmissibility prior to boarding the aircraft.

H.R.Rep. No. 669, 99th Cong., 2d Sess. 35 (1986).

These concerns resulted in a statutory enactment. The 1986 User Fee Statute, Pub.L. No. 99–591, § 205, 100 Stat. 3341–53 (1986) (codified as amended at INA § 286, 8 U.S.C. § 1356) provided that the Service, not the carriers, would be responsible for detaining aliens pending asylum procedures. The statute provided that the cost of this detention would be funded by a surcharge on tickets for entering international passengers, collected by the carrier at the port of embarkation. (This surcharge is now $6 per person. *See* INA § 286(d), 8 U.S.C. § 1356(d).) The 1986 statute established an account in the Treasury to receive this surcharge and directed that funds from that account be used, *inter alia*, to pay the cost of detention of certain excludable aliens:

> The Secretary of the Treasury shall refund out of the Immigration User Fee Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General in providing immigration inspection and preinspection services for commercial aircraft or vessels and ... (v) providing detention and deportation services for excludable aliens arriving on commercial aircraft and vessels.

INA § 286(h)(2)(A), 8 U.S.C. § 1356(h)(2)(A) (as enacted).

The airlines state that the 1986 User Fee Statute transferred the cost of detention of all excludable aliens to the Service, and specifically included those arriving on commercial aircraft. The airlines point out that a primary purpose of the enactment was to relieve the airlines of the custodial role for excludable aliens who seek political asylum. H.R.Conf.Rep. No. 1005, 99th Cong., 2d Sess. 421 (1986) (the purpose of the 1986 User Fee Statute included relieving airlines of the "responsibility to assume custody or financial responsibility for aliens who arrive by plane ... in the U.S. without proper documenta-

tion"). INA § 233, which had imposed this detention role on carriers, was expressly repealed. Pub.L. No. 99–591, § 206, 100 Stat. 3341–56 (1986).

After this enactment the Service adopted new regulations which accepted that the 1986 statute placed upon the Service the "responsibility for physical custody of excludable aliens pursuant to former section 233." 54 Fed.Reg. 100 (1989) (Final Rule). *See, e.g.,* 8 C.F.R. § 235.3(d), *revised at* 54 Fed. Reg. 100–102 (1989) (the Service is responsible for detention of aliens who arrive without documentation allowing entry, or with false documents, or are otherwise inadmissible). However, the Service continued to order the airlines to provide long-term detention of aliens who arrived as TWOV passengers or who were classified as stowaways, while accepting detention responsibility for all other aliens without entry documents.

■ The airlines argue that no exception for such passengers was made in the repeal of INA § 233, that these obligations are now assigned to the United States and funded from the User Fee Account, and that the Service's actions to the contrary are illegal. The airlines are correct that the 1986 statute unambiguously relieved the airlines of custodial and financial responsibility for these aliens. "When we find the terms of a statute unambiguous, judicial inquiry is complete, except 'in "rare and exceptional circumstances." '" *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981) (citations omitted); *see Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("Absent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive.").

The legislative intention to relieve the airlines of the custodial role for aliens awaiting asylum determination is clearly stated, and the statute's plain meaning directly implements that intention. The Service's disregard of this conclusive statutory enactment, and its persistence in ordering the airlines to pay detention and maintenance costs of TWOV and stowaway aliens pending decision

of their requests for political asylum, is stated by the airlines to be an illegal exaction of moneys, recovery of which may be had under the Tucker Act. We thus turn to the issue of Tucker Act jurisdiction, for the Court of Federal Claims held that there was none.

## C. JURISDICTION

 Issues of jurisdiction receive plenary review on appeal. *Gould, Inc. v. United States,* 67 F.3d 925, 928 (Fed.Cir.1995); *Booth v. United States,* 990 F.2d 617, 619 (Fed.Cir.1993). In deciding whether there is subject matter jurisdiction, the allegations stated in the complaint are taken as true and jurisdiction is decided on the face of the pleadings. *Shearin v. United States,* 992 F.2d 1195, 1195–96 (Fed.Cir.1993); *United States v. Cocoa Berkau, Inc.,* 990 F.2d 610, 612 (Fed.Cir.1993); *see Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 808–09, 108 S.Ct. 2166, 2173–74, 100 L.Ed.2d 811 (1988) (jurisdiction is based on the well-pleaded complaint).

 When jurisdiction has been established, the court must nonetheless dismiss the complaint when the plaintiff pleads a cause within the court's jurisdiction but does not assert a set of facts which if proven would support the claim. Such dismissal is deemed an adjudication on the merits. *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) ("If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction."); *Spruill v. Merit Sys. Protection Bd.,* 978 F.2d 679, 686 (Fed.Cir.1992) ("Assuming that jurisdiction has not been challenged, or if challenged, jurisdiction has been found to exist on the basis of well-pleaded allegations in the complaint, a decision by the forum that the complaint fails to state a claim upon which relief can be granted is a decision on the merits of the pleaded cause."); *Ralston Steel Corp. v. United States,* 340 F.2d 663, 667 (Ct.Cl.), *cert. denied,* 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965).

 A party may challenge the court's jurisdictional authority by denying or controverting necessary jurisdictional allegations. *KVOS, Inc. v. Associated Press,* 299 U.S. 269, 278, 57 S.Ct. 197, 200–01, 81 L.Ed. 183 (1936); *Cedars–Sinai Medical Ctr. v. Watkins,* 11 F.3d 1573, 1583 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994). When such challenge is made the court may consider evidence outside the pleadings to resolve the issue. *Reynolds v. Army & Air Force Exchange Serv.,* 846 F.2d 746, 747 (Fed.Cir. 1988). However, in the absence of subject matter jurisdiction there can be no preclusive findings or conclusions on the merits, and dismissal for lack of jurisdiction is without prejudice. *Lewis v. United States,* 70 F.3d 597, 603 (Fed.Cir.1995) (a jurisdictional dismissal is not res judicata); *Wheeler v. United States,* 11 F.3d 156, 159–60 (Fed.Cir.1993); *Burnside–Ott Aviation Training Ctr., Inc. v. United States,* 985 F.2d 1574, 1580–81 (Fed. Cir.1993).

 Thus courts have exercised care to distinguish between absence of jurisdiction and failure of proof, whether the failure is facial (on the pleadings) or factual (outside of the pleadings). *Bell v. Hood,* 327 U.S. at 682–83, 66 S.Ct. at 776; *cf. Osborn v. United States,* 918 F.2d 724, 729 n. 6 (8th Cir.1990). On this framework we turn to the assertion of Aerolineas and PIA that the Tucker Act provides jurisdiction of their claim for moneys illegally exacted.

The Tucker Act assigns to the Court of Federal Claims

> jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). Tucker Act claims may be made for recovery of monies that the government has required to be paid contrary to law. The Court of Claims explained that an illegal exaction claim may be maintained when "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum" that

"was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967). The Tucker Act provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power. 178 Ct.Cl. at 605, 372 F.2d at 1007–08. *See South Puerto Rico Sugar Co. Trading Corp. v. United States,* 167 Ct.Cl. 236, 244, 334 F.2d 622, 626 (1964), *cert. denied,* 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965) (recovery of "exactions said to have been illegally imposed by federal officials (except where Congress has expressly placed jurisdiction elsewhere)"); *United States v. Emery, Bird, Thayer Realty Co.,* 237 U.S. 28, 35 S.Ct. 499, 59 L.Ed. 825 (1915) (tax refund suit). In *Eversharp, Inc. v. United States,* 129 Ct.Cl. 772, 776, 125 F.Supp. 244, 247 (1954) the Court of Claims held that on the allegation that the government had illegally exacted money by enforcement of a regulation that was contrary to statute, the court had jurisdiction under the Tucker Act to render judgment against the United States for recovery of that money. Similarly in *Mallow v. United States,* 161 Ct.Cl. 446, 450 1963 WL 8503 (1963), the court held that the Tucker Act provided jurisdiction in the Court of Claims for recovery of money that the government illegally collected from the plaintiff as fines under void convictions and sentences. *See also Suwannee S.S. Co. v. United States,* 150 Ct.Cl. 331, 335–36, 279 F.2d 874, 876 (1960) (ship owner may recover payment illegally exacted as a condition of receiving permission to sell ship to a foreign purchaser); *Seatrade Corp. v. United States,* 152 Ct.Cl. 356, 360, 285 F.2d 448, 450 (1961) (same).

As the Court of Claims put it in *Clapp v. United States,* 127 Ct.Cl. 505, 512, 117 F.Supp. 576, 580, *cert. denied,* 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658 (1954), an illegal exaction has occurred when "the Government has the citizen's money in its pocket." Suit can then be maintained under the Tucker Act to recover the money exacted. 127 Ct.Cl. at 513, 117 F.Supp. at 580; *Pan American World Airways v. United States,* 129 Ct.Cl. 53, 55, 122 F.Supp. 682, 683–84 (1954) ("the

collection of money by Government officials, pursuant to an invalid regulation" is an illegal exaction and not a tort); *Carriso v. United States,* 106 F.2d 707, 712 (9th Cir.1939) (when a government agent construes a statute as remaining in effect after it has been repealed and uses it as a basis to collect fees, a claim to recover the fees is "founded upon a law of Congress" and "does not sound in tort"). *But cf. United States v. Nederlandsch–Amerikaansche Stoomvart Maatschappij,* 254 U.S. 148, 41 S.Ct. 72, 65 L.Ed. 193 (1920) (unauthorized coercion of payments by governmental agents is tortious).

The Court of Federal Claims held that because no money was required by the government to be paid directly to it by Aerolineas or PIA, the airlines can not state a claim on the theory of illegal exaction, even if the payment requirement were contrary to law. However, such claim may lie if the government required payment to it "directly or in effect," *Eastport,* 178 Ct.Cl. at 605, 372 F.2d at 1007. The amount exacted and paid may be recovered whether the money was paid directly to the government, or was paid to others at the direction of the government to meet a governmental obligation. In *Camellia Apartments, Inc. v. United States,* 167 Ct.Cl. 224, 334 F.2d 667 (1964), *cert. denied,* 379 U.S. 963, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965), the Federal Housing Administration required the plaintiffs to pay private mortgagees a charge on behalf of the FHA, allegedly in violation of statute and by misconstruction of a regulation; the Tucker Act provided jurisdiction to determine whether the charges were illegally exacted by the government.

The plaintiff airlines state that by misinterpreting or misapplying 8 C.F.R. § 235.3(d) and the Form I–426 agreements, the Service compelled the airlines to bear certain costs that by statute in 1986 were removed from the airlines and imposed upon the United States. If Aerolineas and PIA made payments that by law the Service was obliged to make, the government has "in its pocket" money corresponding to the payments that were the government's statutory obligation. Suit can be maintained under the Tucker Act for recovery of the money illegal-

ly required to be paid on behalf of the government.

At the jurisdictional threshold, the airlines have stated a claim for the recovery of monies that they assert were illegally exacted. Thus we review the regulation and other support upon which the government bases the legality of its action. *See Eversharp,* 129 Ct.Cl. at 774–75, 125 F.Supp. at 246. If the airlines fail to establish that the exaction was contrary to law, that failure does not deprive the court of jurisdiction, but serves as an adjudication on the merits. *Bell v. Hood,* 327 U.S. at 682, 66 S.Ct. at 776. We thus turn to the question of whether the authorization on which the Service relies was misinterpreted, misapplied, or invalid, in determining whether "the plaintiff has paid money over to the Government, directly or in effect, . . . in contravention of [law]." *Eastport,* 178 Ct.Cl. at 605, 372 F.2d at 1007.

## D. ILLEGAL EXACTION

### 1. 8 C.F.R. § 235.3(d) is Either Misinterpreted or Void

The airlines state that 8 C.F.R. § 235.3(d) directly contravenes the Immigration User Fee Statute of 1986. The airlines' position is that with the repeal in 1986 of INA § 233, the provision that before 1986 supported this imposition, the regulation is misinterpreted or void.

 Although a court gives appropriate deference to an agency's interpretation, by regulation, of an ambiguous statute that the agency is charged with administering, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), that deference does not permit abdication of the judicial responsibility to determine whether the challenged regulation is contrary to statute or devoid of administrative authority. In this case the Service is not simply interpreting a regulation as it applies to specific facts, but has construed a regulation as replacing and continuing a repealed statute. This construction brings into question the validity of the regulation as construed and enforced. The validity of a regulation is a matter of law. *Jensen v. Brown,*

19 F.3d 1413, 1415 (Fed.Cir.1995); *Brownfield v. United States,* 148 Ct.Cl. 411, 419, 1960 WL 8447 (1960).

The regulation, adopted in 1989, states:

**8 C.F.R. § 235.3(d) Service custody.** The Service will assume custody of any alien subject to detention under § 235.3(b) or (c) of this section, except in the case of an alien who is presented as a Transit Without Visa (TWOV) passenger.

Sections 235(b) and (c) relate to all aliens not entitled to enter the United States including aliens with no entry documents or false documents or aliens carrying documents but who nevertheless appear to inspecting officers to be inadmissible. Thus on its face § 253.3(d) applies to stowaways but carves TWOV aliens out of the group of aliens for which the Service must assume custody.

The airlines state that this regulation can be sustained if it is read as applying to TWOV passengers during their transit through the airport, not TWOV passengers who relinquish that status and claim political asylum. Passengers in transit do not need entry documents, and the airlines agree that they are responsible for custody of passengers during transit. But the regulation can not be sustained if read as refusal by the Service to assume custody of aliens who relinquish TWOV status in order to seek political asylum, for this custodial responsibility was assigned to the Service by statute in 1986, and the prior statutory assignment of custody to the airlines was repealed.

 Numerous regulations implement the requirement that the airlines maintain custody of passengers in transit. None of these regulations relates to aliens who apply for political asylum; all are directed to transit passengers, passing through the airport en route to another country. For example:

**8 C.F.R. § 214.2(c)(1)** An applicant for admission under the transit without visa privilege must establish that he is admissible under the immigration laws; that he has confirmed and onward reservations to at least the next country beyond the United States, and that he will continue his journey on the same line or a connecting line within 8 hours after his arrival. . . .

The privilege of transit without a visa may be authorized only under the conditions that the transportation line, without the prior consent of the Service, will not refund the ticket which was presented to the Service as evidence of the alien's confirmed and onward reservations; that the alien will not apply for extension of temporary stay or for adjustment of status under section 245 of the Act, and that until his departure from the United States responsibility for his continuous actual custody will lie with the transportation line which brought him to the United States. . . .

Many other regulations relate to TWOV passengers. 8 C.F.R. § 212.1(f)(1) provides that a "passport and visa are not required of an alien who is being transported in immediate and continuous transit through the United States in accordance with the terms of an agreement . . . on Form I–426 to insure such immediate and continuous transit through, and departure from, the United States en route to a specifically designated foreign country." 8 C.F.R. § 238.3(c), referring to 8 C.F.R. § 212.1(f)(1), states: "Nothing contained within the provisions of section 286 of the [1986] Act shall be deemed to waive the carrier's liability for detention, transportation, and other expenses incurred in the bringing of aliens to the United States under the terms of this section." The airlines state that § 238.3(c), like § 235.3(d), necessarily relates to the airlines' obligations for TWOV passengers, and that they can not be construed or applied to contradict INA § 286, 8 U.S.C. § 1356, which when enacted in 1986 placed on the Service the responsibility for detention of applicants for political asylum. We agree, for a regulation can not override a clearly stated statutory enactment. *E.g., Skinner v. Brown,* 27 F.3d 1571, 1575 (Fed. Cir.1994) ("We need not defer to the VA's regulation because it is contrary to the plain meaning of the statute."); *Brush v. Office of Personnel Management,* 982 F.2d 1554, 1560 (Fed.Cir.1992) (the "regulation must be held to be invalid since it does not comport with the clear statutory mandate").

■■ 8 C.F.R. § 235.3(d), if limited to the airlines' responsibility for detention of TWOV passengers until departure on their continuation flights, presents no statutory conflict. Thus the airlines provide secure facilities at transit airports for TWOV passengers, who are not illegal aliens, and the Service assumes custody of illegal arrivals. On this reading, 8 C.F.R. § 235.3(d) presents no conflict with the congressional purpose that the airlines be relieved of responsibility for the detention of political refugees. A TWOV passenger is not a political refugee. However, a passenger who requests political asylum forfeits TWOV status, and becomes an alien illegally present in the United States and subject to deportation if the asylum request is denied.

■■ Similarly, INA § 237(a), 8 U.S.C. § 1227(a) when correctly interpreted presents no statutory conflict. This provision merely requires the carrier to bear the cost of detention and maintenance of an alien who is "excluded" and must be "immediately deported." Aliens who request political asylum are "excludable," not "excluded," and can not be deported while an asylum claim is pending.

■■ When a statute has been repealed, the regulations based on that statute automatically lose their vitality. Regulations do not maintain an independent life, defeating the statutory change. The 1986 User Fee Statute relieved airlines of "the responsibility to assume custody or financial responsibility for aliens who arrive by plane . . . in the U.S. without proper documentation." H.R.Conf. Rep. No. 1005, 99th Cong., 2d Sess. 421 (1986), and assigned this responsibility to the Service. As explained for the subsequent set of regulations, 54 Fed.Reg. 100 (1989) (Final Rule), "section 206 of Pub.L. 99–591 . . . places responsibility for physical custody of excludable aliens pursuant to former section 233 of [the INA of 1952] on the Service." There is no suggestion of an exception for excludable aliens who arrive with continuing plane tickets or with no plane tickets.

The Third Circuit, reviewing this statutory change in an action brought under the Administrative Procedure Act, observed that "one of the new statute's primary functions was to reverse the existing rule requiring carriers to bear the expense of detaining aliens pending hearings on their immigration

status." *Dia Navigation Co. v. Pomeroy*, 34 F.3d 1255, 1263 (3d Cir.1994) ("Congress clearly wished to shift the bulk of financial responsibility for detention to INS."); *see also Linea Area Nacional de Chile v. Meissner*, 65 F.3d 1034, 1039 (2d Cir.1995) ("Congress made clear its intention to shift the burden of detaining passengers initially presented as TWOVs from the common carriers to INS.").

Reinforcing these conclusions, the 1986 statute provided funding for the new governmental obligations. The User Fee Account was created and designated to pay for immigration services including long-term detention pending asylum hearings. INA § 286(h)(2)(A), 8 U.S.C. § 1356(h)(2)(A) (the User Fee Account is for, *inter alia*, "providing detention and deportation services for excludable aliens arriving on commercial aircraft and vessels"). It is reported to hold many millions of dollars. *Linea Area Nacional*, 65 F.3d at 1035 (at the time the case was briefed, the User Fee Account contained between $40 and $50 million dollars).

█ In summary, with the repeal of INA § 233, 8 U.S.C. § 1223, the airlines were no longer responsible for the detention of alien passengers pending disposition of their requests for political asylum. 8 C.F.R. § 235.3(d) can not be interpreted and applied to require otherwise.

### 2. The Form I–426 Agreements

█ The irrefutable force of the repeal of INA § 233 can not be overcome by reference to the obligations that are imposed by the Form I–426 agreement that all airlines sign in order to participate in the TWOV program. The Form I–426 agreement does not provide the authorization for requiring the airlines to incur the obligations imposed on the Service by the enactment of the 1986 statute and the repeal of INA § 233.

█ The interpretation of contracts is a question of law, to which we give plenary review on appeal. *C. Sanchez & Son v. United States*, 6 F.3d 1539, 1544 (Fed.Cir. 1993). It is also a question of law whether a specific "agreement" merely memorializes and implements a federal regulatory plan, as

compared with a "contract" whose terms are subject to negotiation. If the Form I–426 agreements are merely an implementation and memorialization of the INA, then any interpretation of the Form I–426 agreements that brings the form into direct conflict with the 1986 amendments to the INA, is unauthorized and unavailable.

We discern no support for the position that the Form I–426 agreements can now substitute for the repealed INA § 233, or even that Form I–426 was intended to govern custody of aliens who claim political asylum. The Form I–426 agreements relate specifically to the TWOV program: they authorize the airlines to carry alien passengers in "continuous and immediate" transit, and require the airlines to provide transit lounges or other secured waiting areas for TWOV passengers. This is the plain context and long-standing implementation of the Form, including the provision on which the government now relies for imposing long-term detention responsibility on the airlines:

4. ... all alien passengers brought to the United States under this agreement shall be detained in quarters provided or arranged for by the line, in the custody of immigration officers of the United States or such other custody as the Commissioner may approve.

However, ¶ 4 is part of the portion of Form I–426 that relates to TWOV passengers. Paragraph 4 does not treat the complex issues of excludable aliens, excluded aliens, political asylum, and the costs and responsibility of long-term custody. These issues, and the myriad regulations they generated are an entirely different set of rules from those implemented by ¶ 4 of Form I–426.

There are portions of Form I–426 that are directed to aliens ineligible for TWOV status. Paragraphs 5 and 7 require the airlines to pay for deportation, and to pay $500 in damages for each alien who does not meet the TWOV requirements:

5. That the line shall, without expense to the Government of the United States, remove to the foreign port from which the alien embarked to the United States any alien brought to the United States under this agreement whenever such alien is

found by the proper officials not to be eligible for passage through the United States in immediate and continuous transit.

7. That for each and every failure to transport any alien brought to the United States under this agreement in immediate and continuous transit through the United States without expense thereto within the time set by the appropriate immigration officer for his departure, the line shall pay to the United States of America, as liquidated damages and not as a penalty, the sum of Five Hundred Dollars ($500), lawful money of the United States.

The Form I–426 agreements also obligate the airlines to pay certain fees. None of these provisions imposes long-term detention and custody obligations.

 The practice and understanding of the parties from the inception of the Form I–426 agreements, before this issue arose (in 1986, with repeal of INA § 233), is relevant to determining the meaning of the agreement's terms. *Dynamics Corp. of Am. v. United States*, 182 Ct.Cl. 62, 73, 389 F.2d 424, 430 (1968). A contract is understood and applied as the parties mutually intended when entering into (or adhering to) the contract; it is not subject to unilateral restructure at the behest and in the interest of one party, to the detriment of the other party.

 Before 1986, Form I–426 was not mentioned or cited as authority for imposing the long-term detention expenses on the airlines. That authority was in INA § 233, where it was quite clearly stated. It is improper now to re-interpret Form I–426 in a way that contradicts and defeats the explicit repeal of INA § 233. Form I–426 does not provide a valid basis for the exactions imposed on the airlines.[2]

### 3. Stowaways

 We turn to the special arguments raised with respect to stowaways. Stowaways have in the past been viewed as "ex-

cluded absolutely." H.R.Rep. No. 1365, 82nd Cong., 2d Sess. (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1703. *See* INA § 273(d), 8 U.S.C. § 1323(d) (prohibiting the landing of stowaways except to receive temporary medical treatment). However, after the Refugee Act of 1980 provided that stowaways may apply for political asylum, they were properly considered "excludable" rather than "excluded." Moreover, the persons here designated as "stowaways" embarked with tickets and destroyed or concealed their documents upon arrival, thus departing from the traditional definition of stowaways as persons who travel without paying for passage.

The relevant statute no longer draws the historical distinction between "excluded" and "excludable" as applied to stowaways. Stowaways are defined as excludable aliens. As amended in 1990, INA § 212(a)(6)(D), 8 U.S.C. § 1182(a)(6)(D) provides that "Any alien who is a stowaway is excludable." Moreover, the Service states in its brief that it no longer classifies as stowaways passengers lacking proper travel documents solely because they lack such documents.

 The 1986 statute drew no distinction between aliens who embarked with continuing tickets and abandoned their TWOV status when reaching the United States, and aliens who embarked with continuing tickets but concealed them and never passed through TWOV status. The 1986 Act placed all aliens under federal, not private, control while their asylum applications are pending, see H.R.Rep. No. 669, 99th Cong., 2d Sess. 35 (1986) (the statute "would require INS to assume, in all cases, all custodial responsibility"), and does not support the Service's distinction among classes of excludable aliens. *See Dia Navigation*, 34 F.3d at 1260 ("Neither the statute nor its legislative history suggest any distinctions between the various categories of 'excludable' aliens for purposes of this reallocation of the burdens of detention.").

---

2. The Court of Federal Claims held that the Form I–426 agreements are not contracts at all, and denied jurisdiction on contract grounds. On the government's theory that the Form I–426 agreement is a contractual basis for the exaction,

the Tucker Act could also provide jurisdiction on this ground. *See* 28 U.S.C. § 1491(a)(1) ("express or implied contract with the United States").

■ The INA is neither silent nor ambiguous concerning the status of stowaways. Stowaways, like others who request asylum, are not "excluded" until their asylum petitions have been rejected. We do not discern in INA § 273(d), 8 U.S.C. § 1323(d) an exception for stowaways. If there are any other distinctions in the treatment of persons who destroy their travel documents en route, they do not override the explicit congressional concern that the airlines not serve as "jailer" of passengers who apply for political asylum. Indeed, the 1993 amendments to the 1986 User Fee Statute clarified that the Attorney General shall pay, from the User Fee Account, the cost of detention services for stowaways. INA § 286(h)(2)(A)(v)–(vi), 8 U.S.C. § 1356(h)(2)(A)(v)–(vi). The statutory words are not ambiguous, and implement the legislative intent on the specific point at issue.

■ The Service improperly required the airlines to take custody, pending processing and decision of asylum petitions, of aliens who were in "stowaway" status because they destroyed or concealed their travel documents.

## CONCLUSION

We conclude that the Tucker Act provides jurisdiction to recover the sums exacted illegally by the Service due to its misinterpretation or misapplication of statutes, regulations, or forms.[3] After 1986 the exaction of payment for detention and maintenance of excludable aliens, pending hearing and decision of applications for political asylum, was contrary to law. To the extent that the Service interpreted its regulations to authorize such exactions after the 1986 repeal of INA § 233, the regulations were either misinterpreted, or are invalid as interpreted. The Service's misapplication of 8 C.F.R.

§ 235.3(d) to impose on the airlines the cost of long-term detention of excludable aliens, after repeal of INA § 233 and the assignment of this obligation to the Service with funding from the User Fee Account, was an illegal exaction of moneys to meet an obligation of the government.

The Court of Federal Claims erred in dismissing the plaintiffs' suits for lack of jurisdiction and in holding that the plaintiffs had not stated a claim on which relief may be granted. On the undisputed facts the plaintiffs are entitled to recovery of the moneys exacted. We vacate the dismissals of the suits brought by Aerolineas and PIA, and remand to the Court of Federal Claims for determination of the sums exacted and for award thereof.

## Costs

Costs to plaintiffs.

*VACATED AND REMANDED.*

NIES, Senior Circuit Judge, concurring.

I concur in the holding that the United States Court of Federal Claims had jurisdiction over the complaint. On the merits, I would hold that the government must respond in damages for requiring appellants to bear the expenses of detention and maintenance of TWOV passengers except to the extent such costs are imposed on carriers by section 237 of the Immigration and Naturalization Act (INA) (8 U.S.C. § 1227 (1988)).

### A

I agree that the carriers have stated Tucker Act claims within the jurisdiction of the Court of Federal Claims under 28 U.S.C. § 1491. Appellants each assert a claim for damages "against the United States founded ... upon ... any Act of Congress." [1]

---

3. In view of this ruling we need not discuss alternative theories of jurisdiction and recovery offered by the airlines, including theories of express or implied contract, damages not sounding in tort, money-mandating statute, regulatory taking, and breach of bilateral governmental agreement. We do not decide whether jurisdiction could also be based on any other premise.

1. I am mindful of the opinion of the Second Circuit in *Linea Area Nacional de Chile S.A. v.*

*Meissner,* 65 F.3d 1034 (2d Cir.1995), that the claim of another carrier was properly brought under the APA and that the monetary award was in effect equitable restitution, the type of relief available under the APA, not damages. *Contra Air Transport Ass'n v. Meissner,* No. 92–0181, 1994 WL 896766 (D.D.C.1994) (Johnson, J.) (unpublished). However, some claims may be phrased legitimately in a way that would invoke either district court jurisdiction or jurisdiction of

As recognized in *United States v. Testan*, 424 U.S. 392, 401–402, 96 S.Ct. 948, 954–55, 47 L.Ed.2d 114 (1976), a Tucker Act claim for damages against the United States based upon a statute may take one of two forms: a claim under a money-mandating statute or a claim for money improperly exacted or retained.[2] A claimant must rely either on a statute that mandates payment of money from the government to the claimant or on an illegal exaction, that is, a payment to the government by the claimant that is obtained without statutory authority. *See Clapp v. United States*, 127 Ct.Cl. 505, 117 F.Supp. 576 (1954). The first is founded on statutory authorization; the second on the absence of statutory authorization. One is the flip side of the other.

The difficulty in this case is that the claimants paid third parties, hotels and the like, not the government directly. Nevertheless, I find the jurisdictional question here indistinguishable from that dealt with in *Pan American v. United States*, 129 Ct.Cl. 53, 122 F.Supp. 682 (1954), a precedential opinion of one of our predecessor courts. In *Pan American*, the INS took certain detainees into custodial detention and then demanded that the carrier reimburse the government for this expense. The carrier paid the government and sued for damages claiming an illegal exaction, *i.e.*, no statutory authority to place the financial burden on the carrier. The court held this stated a claim under the Tucker Act. I see no principled difference between INS paying the expenses and then ordering the carrier to reimburse the government or simply ordering the carrier to assume the expense in the first instance. Either way the government receives the same benefit. The issue in both instances is whether INS had statutory authority for its order.

It is, of course, true that all illegal orders to an entity to assume an expense do not create a claim under the Tucker Act. The government must order assumption of a government obligation. Thus, cases where the government itself had no financial obligation in the matter and receives no direct financial benefit are distinguishable, *e.g.*, *Clevenger Roofing & Sheet Metal Co. v. United States*, 8 Cl.Ct. 346 (1985) (no jurisdiction under Tucker Act where government ordered payment of higher wages to workers by contractor).

I would hold that a statutory claim under 28 U.S.C. § 1491 is stated by the following allegations: (1) that the INS ordered the carriers to assume a government financial obligation of the Attorney General without statutory authorization; (2) that the carriers protested the imposition of this expense at the time they were ordered to do so; (3) that the carriers paid for maintenance during TWOV detention and thereby conferred a financial benefit directly on the government; and (4) that the carriers are thereby entitled to damages.

The government asserts that if the order to pay was beyond the statute, the claim *ipso facto* must be one sounding in tort. This argument is untenable. Every violation of a statute is not a tort. *Wood v. United States*, 961 F.2d 195, 198–99 (Fed.Cir.1992) (a violation of federal laws gives rise to a tort claim only if state law provides basis for liability, citing *Art Metal–U.S.A., Inc. v. United States*, 753 F.2d 1151, 1157 (D.C.Cir.1985)); *Carriso, Inc. v. United States*, 106 F.2d 707, 712 (9th Cir.1939) (rejecting argument that an action to collect monies exacted under a statute which had been repealed was a claim sounding in tort); *Clapp*, 117 F.Supp. at 581 (declining to consider the wrongful exaction of money under the Shipping Act a tort). Certainly this case is not a tort case.[3] The

---

the Court of Federal Claims. *Cf.* 28 U.S.C. § 1500.

2. In *Testan*, 424 U.S. at 401, 96 S.Ct. at 955, the Court stated:

"Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim whether it be the Constitution, a statute, or a regulation does not create a cause of action for money damages unless as the Court

of Claims has stated, that basis 'in itself ... can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *Eastport S.S. Corp. v. United States*, 372 F.2d at 1008, 1009, 178 Ct.Cl., at 607.

3. It is also not one based on the exercise of the power of eminent domain. Without an exercise of lawful authority, no taking claim can be made out.

claim is based on the allegedly erroneous interpretation of a statute by the agency.

## B

The carriers are correct that the imposition on them of the detention expenses at issue here is not authorized. The INS, not the carriers, had responsibility for the detention expenses of a TWOV asylee under the statute, that is, a passenger who is permitted to enter under the asylum statute.

As I understand the governmental process, a statute must establish a program and, in addition, the program must be funded by an appropriation approved by Congress. The recent shutdown of federal agencies bears this out. Moreover, agencies may not secure funds from the public to carry on unfunded programs unless authorized by Congress to do so. As was recently observed by the Third Circuit in *United States v. Rohm & Haas Co.*, 2 F.3d 1265, 1274 (3rd Cir.1993):

> The budget and appropriation process gives executive agencies an incentive to operate efficiently and makes them accountable to the Congress. When an agency asserts the right to secure financing of its activities by assessing its costs against those whom it regulates, that incentive and accountability are lost. Moreover, in the present context, recognition of the authority EPA asserts could result in the funding for a substantial amount of EPA activity, undertaken under a variety

of different statutes, being shifted away from general revenue to specific levies on certain private parties. While it is not the role of the judiciary to determine whether such a change constitutes wise public policy, it is our duty to ascertain congressional intent behind statutory language. We will not presume Congress to have intended a statute to create the dramatic and unusual effect of requiring regulated parties to pay a large share of the administrative costs incurred by the overseeing agency unless the statutory language clearly and unambiguously requires that result.

Simply stated, if Congress does not fund a program with public moneys, the program languishes in limbo unless an agency is specifically authorized to collect fees from the public therefor or otherwise transfer the costs to other entities.

Congress enacted the Refugee Act of 1980, 8 U.S.C. § 1151 *et seq.* in part to conform to certain treaty obligations. That Act provides, *inter alia*, that all aliens physically present in the United States can request asylum (8 U.S.C. § 1158(a)). At that time, a statute, INA § 233 (8 U.S.C. § 1223),[4] had been on the books for some time [5] which authorized the Attorney General to impose on carriers the costs of maintenance of aliens ordered to be held under detention. In addition, INA § 237 (8 U.S.C. § 1227) imposed a more limited liability on carriers for the cost of certain **excluded** aliens who were not allowed into the country, either *per se* excluded

4. Specifically, 8 U.S.C. § 1223 (INA § 233) provided:

(a) Upon the arrival at a port of the United States of any ... aircraft bringing aliens ... the **immigration officers may order a temporary removal of such aliens for examination and inspection** at a designated time and place, but such temporary removal shall not be considered a landing, nor shall it relieve the ... owners ... of the ... aircraft upon which such aliens are brought to any port of the United States from any of the obligations which, in case such aliens remain on board, would under the provisions of this subsection (b) of this section and such ... owners of responsibility for the safekeeping of such aliens: *Provided,* That such ... owners ... may with the approval of the Attorney General assume responsibility for the safekeeping of such aliens during their removal to a designated place for examination and inspection, in which event,

such removal need not be made by an immigration officer.
(b) Whenever a temporary removal of aliens is made under this section, the ... owners ... of the vessel, aircraft, or transportation line upon which they arrived **shall pay** all expenses of such removal [of an alien] to a designated place for examination and inspection or other place of detention and **all expenses arising during subsequent detention,** pending a decision on the aliens' eligibility to enter the United States and until they are either allowed to land or returned to the care of the transportation line or to the vessel or aircraft which brought them. **Such expenses shall include maintenance, medical treatment** in hospital or elsewhere, **burial,** in the event of death and **transfer** to the vessel, aircraft, or transportation line **in the event of deportation....**

5. Predecessor was section 151.

or excluded by order.[6] In 1986, Congress repealed INA § 233, the general provision for carrier liability for detention expenses.[7] The more limited liability provision of INA § 237 remained.

As part of the 1986 amendments, Congress set up a new plan for financing immigration costs. The plan contemplated that INS would receive a yearly appropriation to be used for the detention and maintenance of aliens and, in fact, Congress has made appropriations regularly. The yearly appropriation, however, is to be underwritten by a fund created from fees collected by carriers from passengers at the rate of $5 (now $6) for any passenger requiring immigration services. The carriers pay these fees to the Attorney General who turns them over to the Treasury for deposit in a fund. The statute further provides:

> The Secretary of the Treasury shall refund out of the Immigration User Fee Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General in providing immigration inspection and prein-spection services for commercial aircraft or vessels and in—
>
> . . . .
>
> (v) **providing detention and deportation services for excludable aliens arriving on commercial aircraft and vessels.**

8 U.S.C. § 1356(h)(2)(A) (emphasis added).

Thus, funds collected from passengers pursuant to the statute are credited against the appropriation for the above services to the extent of expenses "incurred by the Attorney General." Adjustment in the fee is contemplated to make inspection and detention services supportable without expenditure from general Treasury funds, although nothing precludes the use of general funds up to the amount of an appropriation.

As stated in the 1986 Conference Report:

> Sec. 205. Provides a general provision which authorizes the Immigration and Naturalization Service to impose a $5.00 fee for immigration inspection of airline and vessel passengers.... The fees shall be

---

6. The section provides:

(a) **Maintenance expenses.** (1) Any alien (other than an alien crewman) arriving in the United States who is excluded under this Act, shall be immediately deported, in accommodations of the same class in which he arrived, unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper. Deportation shall be to the country in which the alien boarded the vessel or aircraft on which he arrived in the United States, unless the alien boarded such vessel or aircraft in foreign territory contiguous to the United States or in any island adjacent thereto or adjacent to the United States and the alien is not a native, citizen, subject, or national of, or does not have a residence in, such foreign contiguous territory or adjacent island, in which case the deportation shall instead be to the country in which is located the port at which the alien embarked for such foreign contiguous territory or adjacent island. The cost of maintenance including detention expenses and expenses incident to detention of any such alien while he is being detained shall be borne by the owner or owners of the vessel or aircraft on which he arrived, except that cost of maintenance (including detention expenses and expenses incident to detention while the alien is being detained prior to the time he is offered for deportation to the transportation line which brought him to the United

States) **shall not be assessed against the owner or owners of such vessel or aircraft** if (A) the alien was in possession of a valid, unexpired immigrant visa, or (B) the alien (other than an alien crewman) was in possession of a valid, unexpired nonimmigrant visa or other document authorizing such alien to apply for temporary admission to the United States or an unexpired reentry permit issued to him, and (i) such application was made within one hundred and twenty days of the date of issuance of the visa or other document, or in the case of an alien in possession of a reentry permit, within one hundred and twenty days of the date on which the alien was last examined and admitted by the Service, or (ii) in the event the application was made later than one hundred and twenty days of the date of issuance of the visa or other document or such examination and admission, if the owner or owners of such vessel or aircraft established to the satisfaction of the Attorney General that the ground of exclusion could not have been ascertained by the exercise of due diligence prior to the alien's embarkation, or (C) the person claimed United States nationality or citizenship and was in possession of an unexpired United States passport issued to him by competent authority.

7. Similarly, Congress eliminated section 101(b) which had imposed the costs for caring for diseased aliens on the carriers.

placed in a special account in the general fund of the Treasury and shall be used to reimburse the INS appropriation for expenses incurred in carrying out certain inspection activities for commercial aircraft and vessels.... The Attorney General ... shall submit a report to the Congress concerning the status of the account, including any balances therein, and recommend any adjustment in the prescribed fee that may be required to ensure that the receipts collected from the fee charged for the succeeding two years equal, as closely as possible, the cost of providing these services....

. . . .

Sec. 206. Provides language proposed by the Senate which would release scheduled passenger airlines and vessels from the responsibility to assume custody or financial responsibility for aliens who arrive by plane or commercial vessel in the U.S. without proper documentation.

H.R.Conf.Rep. No. 1005, 99th Cong., 2d Sess. 420–421 (1986).

After the enactment in 1986 of the fund legislation, the Attorney General proposed new regulations which recognized the legislative change from carrier responsibility to INS responsibility for the custody and detention of excludable aliens stating:

[The Act] places the responsibility for physical custody of excludable aliens pursuant to former section 233 of the Immigration and Nationality Act of 1952 ... on the INS.

53 Fed.Reg. 1791–92 (1988).

In 8 C.F.R. § 235.3(d) the proposed regulations read:

Service custody. The Service will assume custody of any alien subject to detention under § 235.3(b) ["aliens with no documentation or false documentation"] or (c) ["aliens with documents"] of this section.

53 Fed.Reg. 1792 (1988). However, when INS issued final regulations the following year, it appended to the foregoing section a significant limitation on the agency's responsibility for costs of detention by adding the proviso:

... except in the case of an alien who is presented as a Transit Without Visa (TWOV) passenger.

54 Fed.Reg. 100, 101 (1989). The INS attributed the exception for TWOVs from its detention responsibility to the existence of its "Immediate and Continuous Transit Agreements" with carriers:

Although the issue of carrier responsibility for TWOV passengers may be a thorny one, the rules and regulations are very clear. Pub.L. 99–591 did not repeal section 238 of the Act; thus, contracts entered into pursuant to section 238, and in this particular instance we are concerned with carrier financial responsibility for detained TWOV passengers, are valid and enforceable. In sum, carriers are responsible for the detention expenses of detained TWOV passengers while in Service custody as well as having financial responsibility for return transportation of TWOV passengers point to [sic] embarkation following a deportation/exclusion order.

54 Fed.Reg. 101 (1989).

As far as I can determine, there is no statutory authorization at all for INS to impose on carriers the responsibility for expenses attributable to TWOV aliens who seek **and are granted asylum.** While INA § 237 may be invoked, a carrier's liability extends thereunder only to aliens **actually excluded** by order or to those who do not seek asylum.[8] Thus, while the carriers are not completely relieved of liability for detention expenses, their liability is limited to passengers who are ultimately excluded and the due diligence provision of section 1227 gives a reasonable measure of protection even for that class of aliens.

The contracting authority of INA § 238 (8 U.S.C. § 1228) is in line with the statutory scheme Congress had adopted for financing. This statute merely gives INS authority to enter contracts with carriers "to guarantee the passage through the United States in immediate and continuous transit of aliens destined to foreign countries." 8 U.S.C. § 1228(d) (1988). Expenses for TWOV passengers who seek asylum do not fall within

---

**8.** Even stowaways—once *per se* excluded—may now seek asylum.

this contracting authority. At most the authority relates to aliens stopping at the airport en route elsewhere. In any event, more explicit authority to transfer costs would be necessary to uphold INS's action here. To permit this contracting authority to be used as a general fundraiser would permit the agency to sidestep the appropriation process.

Because the INS has no statutory authority to impose detention expenses on the airlines for TWOV passengers who seek asylum except in accordance with section 1227, the appellants prevail on the merits.